Theodore JUSTICE, Plaintiff,

v.

Thomas A. COUGHLIN, III, Daniel A. Senkowski, Donald Selsky, Mark Vann, Helen Worley, Lt. Decell, Lt. Bolak, McSweeney, C.O. Gilbert, Burke, Dalshiem and Hayden, Defendants.

No. 94–CV–1287 (RSP/DS).

United States District Court, N.D. New York.

Oct. 15, 1996.

Theodore Justice, Ridgeway, NC, pro se.

Dennis C. Vacco, Attorney General of the State of New York (Lisa Renee Harris, Assistant Attorney General, of counsel), Albany, NY, for Defendants.

### MEMORANDUM–DECISION AND ORDER

POOLER, District Judge.

### INTRODUCTION

Presently before me are plaintiff Theodore Justice's objections to a report-recommendation from Magistrate Judge Daniel Scanlon, Jr. The magistrate judge recommends that I deny plaintiff's motion for summary judgment and grant defendants' cross-motion for summary judgment. I approve the report-recommendation in large part, but because I

find Justice's due process claim presents issues of fact, I deny summary judgment to both parties on that claim.

## BACKGROUND

Justice, a former inmate in the New York State correctional system, filed this Section 1983 civil rights action on September 30, 1994. Construing his complaint liberally, Justice makes claims of (1) denial of access to the courts and/or prison grievance system, (2) retaliation for filing grievances and complaints, (3) denial of procedural due process in conducting a disciplinary hearing, (4) violation of the Eighth Amendment, and (5) conspiracy. Dkt. No. 2, Compl. ¶¶ 25, 27–28, 35. On June 23, 1995, Justice moved for summary judgment granting him all the relief he had requested in his complaint. Dkt. No. 34. Defendants cross-moved for summary judgment dismissing Justice's complaint. Dkt. No. 45.

The magistrate judge issued a report-recommendation addressing both motions on June 26, 1996. Dkt. No. 49, Report–Recommendation. In the report-recommendation, Magistrate Judge Scanlon found that (1) defendants had not interfered with Justice's right of access to the courts or to the prison grievance system; (2) Justice's claim of retaliation lacked merit because insofar as defendants took action against Justice, they had a legitimate independent basis for their action; (3) plaintiff's due process claim failed because he had not alleged a sufficient liberty interest pursuant to *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); (4) Justice did not offer any competent evidence that the defendants had been deliberately indifferent to a serious medical need or that they had otherwise subjected him to cruel and unusual punishment in violation of the Eighth Amendment; and (5) because Justice neither alleged nor proved a class based animus, his conspiracy claims failed, *Id.* The magistrate judge recommended dismissal of Justice's complaint in its entirety. *Id.* at 14.

Justice has filed timely objections. Dkt. No. 50, Objections. He objects to the magistrate judge's delay in ruling on his motion, arguing that intervening case law—probably *Sandin,* —— U.S. ——, 115 S.Ct. 2293, and its progeny—has prejudiced his case. *Id.* at 7. Because I find that *Sandin* does not bar Justice's due process claim, this objection is moot. However, Justice also contends that he provided substantial evidence to support his claims and particularly his medical claim. *Id.* Finally, Justice requests the assignment of counsel to protect his rights. *Id.*

## DISCUSSION

### I. Standard

Justice objects to the magistrate judge's recommendation that I dismiss his complaint. I therefore review this recommendation *de novo.* 28 U.S.C. § 636(b)(1)(C). Justice does not explicitly object to the recommendation that his motion for summary judgment be denied. Therefore, *de novo* review is not necessary. However, for reasons I discuss below, I would deny Justice's motion even utilizing a *de novo* standard.

Summary judgment shall enter if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The materiality of facts must be determined with reference to the governing substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the initial responsibility of demonstrating that there is no genuine issue of material fact to be decided. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As to any issue on which the moving party does not have the burden of proof, the moving party may satisfy its burden by "pointing out to the district court ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

Once the moving party satisfies this initial burden, "the burden shifts to the nonmovant to proffer evidence demonstrating that a trial is required because a disputed issue of material fact exists." *Weg v. Macchiarola,* 995 F.2d 15, 18 (2d Cir.1993). In satisfying this burden, the non-moving party " 'may not rest upon the mere allegations or denials of the adverse party's pleading, but ... must set

forth specific facts showing that there is a genuine issue for trial.' " Fed.R.Civ.P. 56(e). However, the opponent of summary judgment may include *sworn* allegations in the complaint as part of its opposition. *Franco v. Kelly,* 854 F.2d 584, 587 (2d Cir.1988).

The defendants did not support their motion with affidavits from persons with personal knowledge although they do submit certain unauthenticated institutional records. Dkt. No. 45, Harris Aff'n ¶¶ 6–7, Exs. B–C. Because of the dearth of competent evidence offered in support of the defendants' motion, I view the motion largely as an attack on the sufficiency of Justice's proof and so analyze it. Justice's complaint is not verified, but has submitted two declarations made under penalty of perjury. *See* Dkt. No. 37, Declaration in Support of Motion for Summary Judgment or in the Alternative Particial (sic) Summary Judgment ("Justice Decl."), and Dkt. No. 48, Declaration in Opposition to Defendant's Motion for Summary Judgment ("2d Justice Decl."). I examine those two declarations as well as those of plaintiff's exhibits authenticated by the declarations in determining whether Justice has demonstrated competent evidentiary support for those claims on which he bears the burden of proof.

## II. Access to the Prison Grievance System and to the Courts

· Justice claims that certain of the defendants interfered with his right to complain about his treatment either through the prison grievance system or to the courts.

 The magistrate judge found that Justice did not offer any competent proof that he had been denied access to the grievance system but rather made certain complaints about the slowness of the system and its mechanics. Report–Recommendation at 9. As noted by the magistrate judge, mere violations of an inmate grievance system do not violate the Constitution. *Muhammad v. McMickens,* 1988 WL 7789 at *3 (S.D.N.Y. 1988). The magistrate judge also found that Justice's claim that defendant Lamora refused to notarize a state court petition for Justice lacked merit because Justice's own exhibits demonstrated that the state court excused the missing notarization and dis-

missed the petition because Justice had failed to exhaust administrative remedies. Report–Recommendation at 10; *see also* Dkt. No. 48, Ex. A. In order to have standing to assert a violation of his right of access to the courts, an inmate must demonstrate that he was actually injured. *Lewis v. Casey,* —— U.S. ——, ——, 116 S.Ct. 2174, 2180, 135 L.Ed.2d 606 (1996). Because plaintiff cannot make this critical showing, the magistrate judge correctly recommended that I dismiss Justice's claim that the actions of defendant Lamora violated his right of access to the courts.

## III. Retaliation

 Justice has also complained that after he filed grievances against defendant Mark Vann, the latter retaliated by falsely charging that Justice had threatened to kill him. Compl. § IV, ¶¶ 15–16, 25. To state a retaliation claim under Section 1983, Justice bears the burden of showing that (1) he engaged in constitutionally protected conduct and (2) his constitutionally protected conduct "was a substantial or motivating factor" in the prison officials' decision to discipline him. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996). Because retaliation claims can be fabricated easily, plaintiffs bear a somewhat heightened burden of proof, and summary judgment can be granted if the claim appears insubstantial. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983)). If Justice meets this heightened burden, the defendants may still prevail by showing by a preponderance of the evidence that they would have taken the same action based on proper reasons. *Graham,* 89 F.3d at 79.

 Justice has satisfied the first prong of his burden by pointing to specific grievances and complaints he filed against Vann on November 30, 1993, and January 9, 1994. Justice Decl. ¶¶ 4, 9, 11. Prison grievances are constitutionally protected conduct. *Graham,* 89 F.3d at 80. I therefore examine whether Justice has shown circumstances from which a reasonable fact finder could infer that retaliation was a substantial motivating factor in Vann's decision to process the grievance. Circumstances lending sub-

stance to a charge of retaliatory motive include alleged falseness of the disciplinary charges and the singling out of the plaintiff for discipline although other inmates purportedly engaged in the misconduct. *Id.* at 81. Prior threats of retaliation as well as the fact that a misconduct charge is made shortly after a prisoner files a grievance also tend to show retaliatory motive. *Jones v. Coughlin,* 45 F.3d 677, 680 (2d Cir.1995).

■ Vann filed the misconduct report against Justice on January 18, 1994, some nine days after Justice's second grievance. *See* Dkt. No. 45, Ex. A. However, despite being warned by defendants' Notice of Cross–Motion that he could not rely on the allegations of his complaint but rather must respond with affidavits or other specific proof, *see id.,* Notice of Cross Motion at 2, Justice does not allege in competent form that Vann threatened him with retaliation prior to filing the disciplinary report or that the disciplinary report was false. Given the heightened burden of proof for retaliation claims, I find that Justice has not set forth facts from which a rational fact finder could find that retaliation played a substantial role in Vann's decision to file the disciplinary report. The temporal proximity of the grievances and the disciplinary report standing by itself does not suffice to meet Justice's burden.[1] *Cf. Colon,* 58 F.3d at 873 (indicating that if circumstantial evidence of (1) temporal proximity of protected action and allegedly retaliatory action and (2) plaintiff's prior good conduct were only evidence supporting retaliation claim, court would be inclined to affirm dismissal but that court would reverse based on added direct evidence of threats of retaliation). I reach this conclusion with some reluctance because Justice does allege threats of retaliation in his unsworn complaint. However, Justice himself chose which of his allegations he wished to place in competent evidentiary form.

## IV. Due Process

I next address Justice's due process claim. On January 18, 1994, defendant Vann charged Justice with threatening to kill him.

Dkt. No. 45, Ex. A. Hearing Officer Peter C. Hayden found Justice guilty after a Tier III hearing and imposed a punishment of (1) 180 days in the Special Housing Unit ("SHU"), (2) 180 days loss of packages, commissary, and phone privileges, and (3) six months loss of good time. Dkt. No. 45, Ex. A at 2–3. On March 18, 1994, defendant Selsky modified Justice's sentence to 120 days SHU, 120 days loss of privileges, and 180 days loss of good time. Compl. ¶¶ 4, 16; Dkt. No. 45, Ex. A at 3. On May 5, 1994, Selsky reversed Justice's sentence in its entirety. Dkt. No. 45, Ex. A at 10. Selsky reversed based on his findings that an assistant failed to make contact with a potential witness prior to the hearing and the hearing officer did not allow the inmate to introduce documentary evidence. *Id.* Justice alleges that he was denied due process because he was not afforded adequate assistance and the hearing officer refused to call witnesses and accept documentary evidence without giving adequate reasons. Compl. ¶ 16. Apparently, the documentary evidence disallowed by the hearing officer consisted of Justice's prior complaints against Vann, which Justice attempted to introduce to show that Vann had a motivation to fabricate a misconduct report. Dkt. No. 35, Ex. 129.

Magistrate Judge Scanlon found that plaintiff failed to demonstrate that he had a liberty interest in remaining free from confinement in the SHU that could trigger due process concerns. In so finding, the magistrate judge principally relied on the Supreme Court's 1995 *Sandin* decision, — U.S. —, 115 S.Ct. 2293. *Sandin* significantly altered the conceptual framework to be employed when a prisoner claims that he or she has been deprived of liberty without due process. *See id.* However, the *Sandin* decision does not completely clarify the parameters of prison/due process analysis. *See id.* Therefore, in assessing *de novo* the adequacy of Justice's showing, I consider (1) the *Sandin* decision and earlier Supreme Court precedent that *Sandin* either expressly reaffirmed or expressly disavowed, (2) the New York regulatory framework for punishing disciplin-

---

1. Indeed, Justice filed so many grievances that it would be difficult for any disciplinary action taken against him not to follow fairly shortly upon a grievance.

ary infractions, (3) Second Circuit case law pre-dating *Sandin,* (4) Second Circuit case law post-dating *Sandin,* and (5) cases from the district courts in this circuit post-dating *Sandin.*

*A. Sandin*

The facts of *Sandin* are crucial in assessing the decision's scope. DeMont Conner, an inmate serving a thirty year to life sentence in the Hawaii prison system, was charged by prison officials with "high misconduct" and "low moderate misconduct." *Id.* at ——, 115 S.Ct. at 2296. Hawaii prison regulations established a "hierarchy of misconduct ranging from greatest misconduct to minor misconduct." *Id.* at —— n. 1, 115 S.Ct. at 2296 n. 1 (internal quotations and citations omitted). The maximum sentence for high misconduct was thirty days. *Id.* The adjustment committee that heard the charges against Conner refused his request to present witnesses at the hearing. *Id.* at ——, 115 S.Ct. at 2296. The committee then found Conner guilty and sentenced him to the maximum allowable sentence, thirty days in the special holding unit. *Id.* Nine months later, a prison administrator reversed the high misconduct charge and expunged Conner's record on that charge. *Id.*

In rejecting Conner's due process claim, the Supreme Court found that he had no protected liberty interest that would require defendants to accord him the procedural protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Id.* at ——, 115 S.Ct. at 2302. The court's analysis reaffirmed the due process framework set forth in *Wolff* and rejected portions of an alternative framework contained in a later case, *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). *Id.* at —— – ——, 115 S.Ct. at 2298–2300. Parsing the *Sandin* decision therefore requires a brief discussion of the holdings in *Hewitt* and *Wolff.* A third case, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), is also relevant to an understanding of *Sandin.*

In *Wolff,* a class of inmates alleged that disciplinary proceedings employed by the Nebraska Penal and Correctional Complex violated due process. *Wolff,* 418 U.S. at 542–43, 94 S.Ct. at 2968. Nebraska statutes required the chief executive officer of a prison to accord an inmate credits toward his sentence for good behavior. *Id.,* 418 U.S. at 546 n. 6, 94 S.Ct. at 2970 n. 6 (citing Neb.Rev. Stat. § 83–1,107 (Cum.Supp.1972)). The official could, however, deduct good time credit and confine an inmate to a disciplinary cell for flagrant or serious misconduct. *Id.* at 545–47, 94 S.Ct. at 2969–70 (citing Neb.Rev. Stat. § 83–185 (Cum.Supp.1972)). The Supreme Court found that although the Constitution itself did not guarantee a right to good time, Nebraska had created this right by statute and had implied that good time once accrued could only be lost by serious misconduct. *Id.* at 557, 94 S.Ct. at 2975. The court characterized the right to good time as one of "real substance," and found that the state was required to observe "the minimum requirements of procedural due process" before depriving a prisoner of the right it had bestowed. *Id.* at 557–58, 94 S.Ct. at 2975–76.

*Meachum* applied the *Wolff* framework to a complaint by a prisoner concerning his involuntary transfer to a less favorable prison within the Massachusetts prison system. *Meachum,* 427 U.S. at 216, 96 S.Ct. at 2534. The Supreme Court held that the prisoner had not demonstrated that he had a liberty interest that protected him from an involuntary transfer. *Id.* at 223–24, 96 S.Ct. at 2537–38. The court began by noting that not every "change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause." *Id.* at 224, 96 S.Ct. at 2538. Distinguishing *Wolff,* the court stated that the right in *Wolff* had its genesis not in the Constitution but in Nebraska law. *Id.* at 226, 96 S.Ct. at 2539. Because Massachusetts gave prison officials unfettered authority to transfer prisoners, the court held that Massachusetts law could not be the basis of a liberty interest sufficient to require due process. *Id.* at 226–27, 96 S.Ct. at 2539–40.

In *Hewitt,* the Supreme Court considered the due process issue within the context of a prison's decision to place a prisoner in less favorable conditions for administrative rea-

sons. *Hewitt,* 459 U.S. at 462, 103 S.Ct. at 866–67. The Supreme Court reaffirmed that liberty interests could arise either from the Constitution itself or from the laws of a state. *Id.* at 466, 103 S.Ct. at 868–69. The court found that the Constitution provided no protectable liberty interest because prisons have wide discretion and prisoners should anticipate facing administrative segregation at some point in their prison life. *Id.* at 467–68, 103 S.Ct. at 869–70. The court next turned to the plaintiff's argument that the state had nevertheless created a liberty interest subject to due process protections through statute. The Pennsylvania statute indicated that administrative confinement would not occur absent certain substantive predicates and that certain procedures were mandatory. *Id.* at 471–72, 103 S.Ct. at 871–72. Because of the mandatory language, the Supreme Court held that Pennsylvania had created a liberty interest subject to due process protections, albeit less extensive protections than those required for deprivation of good time. *Id.* at 472, 103 S.Ct. at 872.

The author of *Hewitt,* Chief Justice Rehnquist, held for the court in *Sandin* that the rationale of *Hewitt* as interpreted by the lower federal courts had unduly interfered with the need for prison administrators to run their prisons, created a disincentive for prison officials to codify their practices, and spawned a flood of frivolous litigation. *Sandin,* —— U.S. at —— – ——, 115 S.Ct. at 2299–2300. The *Hewitt* court went astray, the Chief Justice implied, when it failed to determine whether the state had created a right of real substance before addressing the mandatory language of the statute creating the right. *Id.* at ——, 115 S.Ct. at 2298.

The *Sandin* court therefore directed a return to the principles of *Wolff* to assess the validity of a liberty interest claimed to rest on state statute or regulation. *Id.* at ——, 115 S.Ct. at 2300. Applying these principles, the Court rejected Conner's argument that any solitary confinement automatically triggers the protection of the Due Process clause. *Id.* While recognizing that a state could create liberty interests protected by the Due Process Clause, the Court held "these interests will be generally limited to

freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

Turning to Conner's particular claim, the Court found that he had not shown an atypical or significant deprivation. *Id.* at ——, 115 S.Ct. at 2301. In making this finding, the Court addressed several factors. First, it noted that disciplinary segregated confinement "with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Id.* The court characterized administrative segregation and protective custody as "totally discretionary." *Id.* In fact, even inmates in the general population were subject to "significant amounts of 'lockdown time.'" *Id.* Thus, the court found that "[b]ased on a comparison between inmates inside and outside disciplinary segregation, the State's actions in placing [Conner] there for 30 days did not work a major disruption in his environment." *Id.*

Next, the Court found that nothing in Hawaii law required "the parole board to deny parole in the face of a misconduct record or to grant parole in its absence." *Id.* at ——, 115 S.Ct. at 2302. The Court therefore found that any connection between the finding of misconduct and Conner's sentence was "simply too attenuated to invoke the procedural guarantees of the Due Process Clause." *Id.* In a footnote, the Court also pointed out that Hawaii had expunged Conner's record so that he personally had no chance of receiving a delayed release based on the record of misconduct. *Id.* n. 10.

Finally, the Court held: "the regime to which [Conner] was subjected as a result of his misconduct hearing was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at ——, 115 S.Ct. at 2302.

*Sandin* left unanswered two questions that affect my disposition of these motions. First, because the maximum potential penalty for Conner's offense was the penalty he actually received, it is unclear whether in

applying a *Sandin* analysis, the court should look to the potential penalty a disciplinary authority can impose or the penalty the authority actually did impose. Ancillary to this question is the question of whether the expungement of a disciplinary record after the inmate has begun to serve his or her sentence obviates an otherwise existing liberty interest. The Supreme Court in *Sandin* noted that Conner's record had been expunged but did not rest its decision on this fact. Second, because the Court addressed the "atypical and significant" test in a particular factual context, its outer boundaries are unclear. In particular, it is difficult to predict how the Court would address a longer SHU sentence, an SHU sentence that formed a greater proportion of the inmate's sentence of imprisonment, a disciplinary confinement situation that did not mirror the conditions of administrative segregation or protective custody, or a situation in which administrative segregation or protective custody were not totally discretionary.

As discussed previously, *Wolff*, which the Supreme Court explicitly reaffirmed, may assist in answering these questions. Moreover, pre-*Sandin* caselaw from the Second Circuit sheds some light on the potential versus retrospective analysis. The Second Circuit has also had the opportunity to address Due Process concerns in the prison discipline context since *Sandin*. Finally, the district courts considering New York's particular regulatory and statutory scheme have taken a variety of approaches to both of the issues presented. In order to understand the Second Circuit and district court opinions, it is first necessary to understand New York's regulations on disciplinary confinements.

### B. The New York Regulatory Framework

New York provides for three tiers of disciplinary hearing. N.Y.Comp.Codes R. & Regs. tit. 7, § 270.3(a). A Tier I or violation hearing can result in a maximum penalty of loss of certain privileges for up to thirteen days or imposition of one additional work task per day for a maximum of seven days.

*Id.*, § 252.5(a). In a Tier II hearing, the hearing officer can discipline the inmate with a range of penalties including confinement to the SHU for up to thirty days but may not impose loss of good time. *Id.*, § 253.7(a). A Tier III hearing officer can impose the most serious penalties, including confinement to a special housing unit for a term limited only by the inmate's sentence, *Id.*, § 254.7(a)(3), and loss of a specified period of good behavior allowance, *id.*, § 254.7(a)(6). The potential penalties allowable in *Sandin* thus most closely approximate those available in a Tier II hearing. Both in *Sandin* and in a Tier II hearing, the maximum penalty a hearing officer could impose was 30 days in the SHU.

In addition to disciplinary admissions as the result of a Tier II or Tier III hearing, an inmate may be admitted to the SHU for several other reasons, including: detention prior to a hearing or on receipt from another correctional facility if the inmate's record raises reasonable questions concerning willingness to adhere to prison rules, *id.*, § 301.3(a)(1)–(2); administrative segregation if the facility has determined that the "inmate['s] presence in general population would pose a threat to the safety and the security of the facility," *id.*, § 301.4; protective custody, *id.*, § 301.5; keeplock admissions for various reasons in minimum or medium security facilities, *id.*, § 301.6; and for other reasons, *id.*, § 301.7(a). The regulations direct prison officials to review a detention admission at least once every twenty-four hours.[2] *Id.*, § 301.3(c). Inmates placed in administrative segregation must have their status reviewed every seven days for the first two months and every thirty days thereafter by a three-person committee. *Id.*, § 301.4(c). Inmates placed into involuntary protective custody receive a hearing within fourteen days and a review every thirty days thereafter. *Id.*, § 330.3(b). Finally, an inmate admitted to the SHU for any other reason must be allowed a meeting with the Superintendent's designee concerning his or her placement. *Id.*, § 301.7(a).

---

**2.** If a misbehavior report has been issued, Section 251–2.2 of title 7 applies. *Id.* The detention timelines also do not apply in detention when a notice for protective custody or administrative segregation has been issued. As noted below, each of these forms of custody has its own procedural requirements.

### C. Second Circuit Caselaw Prior to Sandin

Prior to *Sandin*, an inmate "charged with a rules violation that could lead to the loss of good-time credits or to confinement in the SHU," had to be accorded the procedural rights spelled out by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. at 558, 94 S.Ct. at 2976. *Benitez v. Wolff*, 985 F.2d 662, 665 (2d Cir.1993). Moreover, in this circuit, a potential penalty triggered a right to the procedural protections of *Wolff*, regardless of the actual penalty imposed. *McCann v. Coughlin*, 698 F.2d 112, 121 (2d Cir.1983) (holding that "the discretionary authority of an Adjustment Committee to sentence an inmate to several successive seven day sentences" would require procedural protections); *McKinnon v. Patterson*, 568 F.2d 930, 939 (2d Cir.1977) ("To be workable, the procedural requirements applicable to the Board under the due process clause must depend upon the maximum penalty that may be imposed and not upon some lesser penalty that is imposed in any particular case"), *cert. denied*, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978). However, the Second Circuit found no deprivation of a liberty interest where an inmate sentenced as the result of a disciplinary hearing otherwise subject to *Wolff* incurred no penalty at all because his hearing was administratively reversed prior to the inception of his sentence. *Young v. Hoffman*, 970 F.2d 1154, 1156 (2d Cir.1992), *cert. denied*, 510 U.S. 837, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993). Although the *Young* court partially explained its decision by stating that the administrative reversal was part of the process Young was due and therefore cured any earlier procedural defect, *id.*, the Second Circuit sharply limited this approach in a later case. *See Walker v. Bates*, 23 F.3d 652 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995). In *Walker*, the court held that once an inmate began to serve his disciplinary sentence, a later administrative reversal could not cure the earlier procedural violation. *Id.* at 658–59.

### D. Post–Sandin Second Circuit Case Law

Second Circuit decisions since *Sandin* establish that *Sandin* applies retroactively, *Samuels v. Mockry*, 77 F.3d 34, 37 (2d Cir. 1996), and that the plaintiff has the burden of showing "both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin*, and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir.1996).

However, a review of published decisions since *Sandin* demonstrates that the Second Circuit has yet to delineate the outer boundaries of *Sandin's* reach. In its first post-*Sandin* decision, the court considered Raul Rodriguez's claim that his three-day confinement in administrative segregation without a hearing violated procedural due process. *Rodriguez v. Phillips*, 66 F.3d 470, 479 (2d Cir.1995). While indicating that *Sandin* cast doubt on prior cases holding that inmates have a liberty interest in remaining free from administrative segregation created by New York regulation, the court disposed of Rodriguez's claim on qualified immunity grounds. *Id.* at 480–81.

Although *Black v. Coughlin*, 76 F.3d 72 (2d Cir.1996), does not interpret *Sandin*, it may have implications for the interpretation of *Sandin* in this circuit. In *Black*, the district court denied a prisoner leave to amend to add additional defendants on his claim that defendants placed him in the SHU for 180 days without appropriate procedural protections. *Id.* at 73. The district court premised its denial in part on statute of limitations grounds, holding that the prisoner's claim accrued when prison officials affirmed the ruling placing him in confinement. *Id.* at 74. The Second Circuit reversed, applying *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), to Black's claim, and holding that his claim did not accrue until a state court reversed his disciplinary sentence. *Id.* at 75. The court allowed Black to amend without reference to *Sandin* although arguably the district court would have been correct in denying leave to amend if *Sandin* barred Black's claim.

In *Branham v. Meachum*, 77 F.3d 626 (2d Cir.1996), an inmate claimed that a Connecti-

cut Department of Correction administrative directive gave him the right to have a review of his restraint status every thirty days. *Id.* at 629. Branham claimed that he was put on lockdown, placed on full restraint status for fifty-two days, denied outdoor recreation for twenty-two days, and forced to shower while wearing leg irons without a prior hearing. *Id.* at 629. The Court of Appeals directed the district court to allow Branham to amend his complaint "to allege sufficient facts to state a cause of action under *Sandin.*" *Id.* at 630.

*Samuels* vacated an order granting summary judgment against an inmate who alleged that his placement into a limited privileges program without a hearing violated his right to procedural due process. *Samuels,* 77 F.3d at 35. Finding that the district court had overlooked a material issue of fact as to whether the inmate actually refused to participate in a program and thus merited admission to the limited privileges program, the Court of Appeals remanded the case to the district court for consideration of whether the plaintiff had stated a case under *Sandin.* *Id.* at 36–38. The court noted that "[i]t is . . . unclear to what extent the *Sandin* analysis confers a liberty interest on inmates subject to a state regulation that has been held under the *Hewitt* line of cases to confer no liberty interest in the first place." *Id.* at 37–38. The court also stated that fact-finding might be necessary to determine whether the inmate had a protected liberty interest under *Sandin.* *Id.* at 38.

In *Frazier v. Coughlin,* the court considered Charles Frazier's claim that a twelve-day pre-hearing stay in the SHU, a 30 day sentence to cell confinement, and an administrative decision to place him in the prison's close supervision unit ("CSU") implicated a liberty interest sufficient to trigger due process protections. 81 F.3d 313, 315 (2d Cir. 1996). The decision does not indicate whether Frazier was disciplined after a Tier II or a Tier III hearing. The CSU was less restrictive than the SHU because other than ineligibility for certain jobs and greater security measures, the inmate enjoyed the same conditions as a prisoner in general population. *Id.* at 315–16. Moreover, prison regulations

explicitly allowed an inmate's placement in the CSU without a prior hearing, *id.* at 316, and Department of Corrections regulations allow placement of an inmate in the SHU pending the disposition of disciplinary charges, *id.* at 315. The court found that Frazier's 12–day SHU claim failed under the *Sandin* standard because his confinement conditions "fell within the expected parameters of the sentence imposed by a court of law" (internal quotation omitted) and Frazier had failed to show that the sentence would inevitably affect the duration of his sentence. *Id.* at 317. The court also found that Frazier had failed to show an atypical deprivation with respect to his CSU claim because the conditions of confinement were almost exactly the same as for those inmates in the general population. *Id.* at 318.

In *Giakoumelos v. Coughlin,* the Second Circuit affirmed a district court's dismissal on collateral estoppel grounds of an inmate's claim that his 365 day sentence to the SHU and one year loss of good time deprived him of a liberty interest without due process. 88 F.3d 56, 57 (2d Cir.1996). The court noted in passing, however, that a recent decision from the Eleventh Circuit "may throw doubt on defendants' argument" that Giakoumelos had no protected liberty interest. *Id.* at 62 (citing *Williams v. Fountain,* 77 F.3d 372, 374 n. 3 (11th Cir.1996)). In *Williams,* the court assumed that an inmate who spent a year in solitary confinement had a liberty interest because his sentence represented "substantially more 'atypical and significant harship[s] . . . in relation to the ordinary incidents of prison life,'" than did the confinement in *Sandin.* *Williams,* 77 F.3d at 374 n. 3 (quoting *Sandin v. Conner,* —— U.S. at ——, 115 S.Ct. at 2300).

Finally, in *Bedoya v. Coughlin,* the Second Circuit left open the possibility that a thirty day keeplock sentence implicated a liberty interest and disposed of the case on the basis that the inmate was not denied due process. 91 F.3d 349, 352 (2d Cir.1996).

In summary, the Second Circuit has determined to date only that a 12 day pre-hearing detention in the SHU and confinement to the CSU do not implicate a liberty interest. *Frazier,* 81 F.3d at 317–18. The court has

not decided *Sandin's* impact on keeplock, administrative confinement, and confinement to the SHU for more than twelve days or for reasons other than pre-hearing detention.

### E. District Court Cases

The district courts in New York have approached *Sandin* from a variety of perspectives. Many construe the holding broadly as barring most, if not all, due process claims based on disciplinary confinement in the SHU. Among these cases, some simply hold that SHU confinements of a certain length do not implicate a liberty interest at least where the inmate does not specify any particular hardship imposed upon him.[3] *See, e.g., Nogueras v. Coughlin,* 1996 WL 487951 at *5 (S.D.N.Y.1996) (210 days SHU confinement); *Polanco v. Allan,* 1996 WL 250237 at *3 (N.D.N.Y.1996) (McAvoy, C.J.) (365 days); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1108 (S.D.N.Y.1995) (60 days); *but see, e.g., Hutchinson v. Blaetz,* 1996 WL 374164 at *4 (S.D.N.Y.1996) (286 day confinement in SHU presents an issue of fact on atypicality and significance under *Sandin* ); *Bishop v. Keane,* 1995 WL 384443 at *3 n. 4 (S.D.N.Y. 1995) (87 day keeplock confinement presents issues of fact under *Sandin* test). Other courts have compared the length of the inmate's confinement in the SHU to his prison sentence and applied a proportionality test to determine whether a particular confinement imposes an atypical and significant deprivation. *See, e.g., Arce v. Coughlin,* 1996 WL 252371 at *7 (citing cases) (S.D.N.Y.1996). Several decisions have also relied on the fact that inmates can be confined to the SHU for reasons other than discipline as a basis for holding that punitive SHU confinement is not an atypical or significant deprivation. *See, e.g., Jones v. Kelly,* 1996 WL 515486 at *2 (W.D.N.Y.1996); *Nogueras,* 1996 WL 487951 at *5; *Jackson v. Pagluighi,* No. 93–CV–1581, slip op. at 10 (N.D.N.Y. July 31, 1996) (Homer, M.J.); *Rosario v. Selsky,* 1995 WL

764178 at *4 (S.D.N.Y.1995); *Carter v. Carriero,* 905 F.Supp. 99, 103–04 (W.D.N.Y. 1995).

■ The cases discussed in the preceding paragraph all consider the actual length of the sentence imposed by the hearing officer. A few cases, however, have adopted the potential penalty approach reflected in pre-*Sandin* Second Circuit cases. *See, e.g., Martinez v. Coombe,* No. 95–CV–1147, slip op. at 13–16 (N.D.N.Y. Aug. 22, 1996) (Di Bianco, M.J.) (recommending denial of defendants' summary judgment motion based on potential penalty faced by the inmate); *Campo v. Keane,* 913 F.Supp. 814, 821 (S.D.N.Y.1996); *cf. Moolenaar v. Finn,* 1996 WL 112200 at *4 n. 4 (S.D.N.Y.1996) (Cote, J.) (dismissing plaintiff's *Sandin* claim stemming from a Tier II hearing but indicating in dicta that a Tier III hearing which could subject a prisoner to "a virtually unlimited term in solitary confinement and a loss of good time credits" may require the court to engage in fact finding).[4]

■ As discussed below, consideration of the potential penalty that could be imposed by a hearing officer rather than the actual penalty the hearing officer imposes (1) better comports with pre-*Sandin* Second Circuit law that does not conflict with *Sandin;* (2) is consistent with *Sandin* although not necessarily mandated by *Sandin;* (3) is more consistent with *Wolff* than the alternative approach; and (4) provides a workable framework for corrections officials. In addition, I disagree with those courts that have compared the conditions faced by an inmate facing disciplinary confinement to those confined to the SHU for administrative confinement, detention, or protective custody and believe that the relevant comparison in New York is to conditions in the general population. Therefore, I hold that because Justice faced both unlimited time in the SHU and

---

3. I make no attempt here to categorize or describe those cases which assess lower level disciplinary confinements such as keeplock in a prisoner's own cell or administrative confinement under *Sandin.*

4. Judge Cote has also held, however, that an 89 day keeplock penalty imposed as the result of a

Tier III hearing did not implicate a liberty interest and that reversal of the plaintiff's disciplinary sentence obviated any liberty interest that might have been triggered by his loss of 12 days good time. *Rivera v. Coughlin,* 1996 WL 22342 at *5 (S.D.N.Y.1996).

1324

unlimited loss of good time in his Tier III hearing, he had a liberty interest. Moreover, based on *Walker* and *Black*, I find that the subsequent administrative reversal of Justice's conviction did not retroactively invalidate his liberty interest because he served a substantial portion of his SHU sentence.

As noted previously, *McCann* and *McKinnon* require that I look to the potential penalty absent any conflict with *Sandin*. See *McCann*, 698 F.2d at 121; *McKinnon*, 568 F.2d at 939. *Sandin* contains no discussion of whether the potential or actual penalty imposed on a prisoner should be the benchmark for defining a liberty interest. Because the actual penalty the prisoner received was the same as the maximum penalty he faced in *Sandin*, it is not possible to infer from the court's holding that it adopted either approach. *Sandin*, —— U.S. at —— n. 1, 115 S.Ct. at 2296 n. 1. However, *Wolff*, a decision that the *Sandin* court reaffirmed, premised its procedural requirements on the penalty a class of prisoners faced rather than the actual penalty any one prisoner received. See *Wolff*, 418 U.S. at 553, 94 S.Ct. at 2973. Finally, an actual penalty analysis is unworkable. Assuming that certain penalties that a corrections official might impose in a Tier III hearing—for example ten years in the SHU—would be an "atypical and significant deprivation" within the meaning of *Sandin*, the official would have to determine the sentence before determining whether the inmate was entitled to procedural protections.

However, those district courts that have premised their rejection of due process challenges on the similarity in conditions faced by inmates in disciplinary confinement in the SHU and those placed in the SHU for administrative confinement, pre-hearing detention, or protective custody would not necessarily agree that an extremely long sentence in the SHU would implicate a liberty interest. I do not adopt their approach for several reasons. First, *Sandin* compared the conditions of inmates in disciplinary confinement both to those of inmates in administrative segregation and protective custody and to those of inmates in the general population. *Sandin*, —— U.S. at ——, 115 S.Ct. at 2301.

Second, while the *Sandin* court relied in part on the similarity of conditions between inmates in disciplinary confinement in the SHU and inmates in administrative confinement, it also emphasized that "the State's actions in placing [Conner in the SHU] for *30 days* did not work a major disruption in his environment." *Id.* (emphasis added). Finally, the *Sandin* court characterized administrative and protective custody in Hawaii as "totally discretionary." *Id.* Similar admissions in New York are not totally discretionary. See N.Y.Comp.Codes R. & Regs. tit. 7, § 301.3 (setting standards for detention admissions); *id.*, § 301.4 (setting standards and mandating review procedures for administrative segregation admissions); *id.*, § 330.3(b) (mandating hearing within fourteen days for involuntary protective custody). Although *Sandin* may well cause the Second Circuit to reconsider its position that confinements such as administrative segregation implicate a liberty interest, see *Rodriguez*, 66 F.3d at 480, these confinements would still not be totally discretionary under New York law. Therefore, the relevant comparison for *Sandin* purposes in New York is between inmates in the SHU for disciplinary purposes and inmates in the general population.

I note that certain courts have held that retroactive restoral of good time and reversal of an administrative sentence removes the liberty interest that would otherwise be present. If the inmate spends no time in the SHU, this approach may be valid. *Compare Young*, 970 F.2d at 1156, *with Walker*, 23 F.3d at 658–59. However, Justice began his sentence and served more than three months before he was released. Therefore, he lost a liberty interest. *Walker*, 23 F.3d at 658–59.

Whether Justice lost this liberty interest in violation of procedural guarantees mandated by the Due Process Clause remains for resolution at trial. Neither party has provided the record of the hearing that resulted in Justice's confinement in the SHU. Justice's penalty was reversed because of failure by his assistant to make contact with a potential witness prior to the trial and the hearing officer's refusal of documentary evidence concerning staff harassment. Dkt. No. 45, Ex. A at 10. Prisons have a constitu-

tional obligation to provide assistance to an inmate facing disciplinary charges particularly if that inmate is confined in the SHU and thus unable to marshal evidence himself. *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir. 1988). However, it is not clear from the record before me now that the assistant's failure to contact a witness fell below the minimally acceptable level for assistance or that Justice was unable to properly present his claim concerning Vann's retaliatory motive without the documents the hearing officer refused. Nor is the contrary proposition evident from the current record. Not every breach of prison regulations concerning hearings constitutes a due process violation. *See Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995). Therefore, both parties' summary judgment motions on plaintiff's due process claim must be denied.

## V. Eighth Amendment

The basis of Justice's Eighth Amendment claim is not entirely clear. He alleges that all of the defendants' actions described in paragraphs four through thirty-two of his complaint violated the Eighth Amendment. Compl. ¶ 34. These actions include various defendants' alleged interference in Justice's right to file grievances and/or court actions, withholding of extra clothing or blankets, alleged retaliation, Justice's confinement in the SHU, and his transfer to a maximum security facility despite his claim that he was entitled to housing in a medium security facility. Liberally interpreting Justice's complaint, the magistrate judge also found that Justice complained of a failure by defendants to safeguard him from harm by other inmates. Report–Recommendation at 10–14.

The magistrate judge correctly found that Justice failed to allege a sufficient factual predicate for his Eighth Amendment claim.[5]

 The Eighth Amendment requires prisons to "ensure that inmates receive adequate food, clothing, shelter and medical care, and ... 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan,* 511 U.S. 825, ——, 114

S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200–01, 82 L.Ed.2d 393 (1984)). In order to prevail on a conditions claim, the inmate must show that prison officials acted with deliberate indifference to one of these basic human needs. *Wilson v. Seiter,* 501 U.S. 294, 303, 111 S.Ct. 2321, 2326–27, 115 L.Ed.2d 271 (1991). In a medical indifference claim, the inmate must also show that the condition of which he complains "'may produce death, degeneration, or extreme pain.'" *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995)).

As noted previously, Justice made only two submissions in competent evidentiary form: a declaration in support of his own summary judgment motion ("Justice Decl."), and a subsequent declaration in opposition to the defendants' summary judgment motion ("2d Justice Decl."). These documents contain the following conditions complaints: (1) Justice complained to defendant Coughlin concerning lack of adequate heat and clothing, Justice Decl. ¶ 3; (2) a bucket of water was thrown in his cell, *id.* ¶ 8; (3) defendant Gilbert turned off Justice's water and lights for seventy-two hours, and Justice had a hard time getting them restored, *id.* ¶ 13; (4) despite Justice's claim that he was entitled to be housed in a medium security facility, he was transferred to a maximum security facility, *id.* ¶ 20; (5) Justice is "victim prone" and has a "high profile," 2d Justice Decl. ¶ 11; (6) the prison system's heater is faulty and excessively cold in the winter, *id.* ¶ 12, and (7) Justice has a "medical" for long underwear and blankets, but the prison nurse refused to advise authorities of his need, *id.* In addition, Justice submitted exhibits demonstrating that he attempted to call his medical need to defendants in positions of authority. *See, e.g.,* Dkt. No. 35, Exs. 7–9. Justice also claimed that he had grievance decisions documenting his need for these items in his possession. *Id.,* Ex. 11. However, Justice did

---

5. The magistrate judge did not explicitly address each of Justice's allegations. However, as discussed in the text of his opinion each of Justice's

Eighth Amendment claims is subject to dismissal because, as Magistrate Judge Scanlon noted, they lack a factual basis.

not include the decisions in his voluminous submissions to this court. Justice also conceded that he received a pair of long underwear but complained that he did not receive a second pair or an extra blanket. *Id.,* Ex. 19.

Justice's sworn allegations are far too conclusory to meet the stringent requirements for an Eighth Amendment claim. He never identifies the condition from which he purportedly suffered. Nor does he produce the documentation that he allegedly has concerning this condition.

Justice also makes no claim that another inmate ever actually harmed him or threatened to harm him. Justice has not offered any proof that the defendants "completely disregarded" his safety or indeed that they failed to protect him from other inmates at all. *See Jones v. Kelly,* 918 F.Supp. 74, 80 (W.D.N.Y.1995) (quoting *Smith v. Fiedler,* 867 F.Supp. 832, 835 (E.D.Wis.1994), *aff'd,* 68 F.3d 477 (7th Cir,1995)).

Nor does Justice make any specific factual allegations indicating that conditions in the SHU deprived him of any of the basic necessities of life. While arguing that the prison was too cold, he does not indicate how cold or describe the effect of the cold on his medical condition in any competent form.

Finally, Justice has not put forth any factual allegations demonstrating that conditions in the maximum security prison to which he was transferred constituted cruel and unusual treatment. Prisons may generally transfer prisoners to institutions with less favorable conditions without constitutional constraint. *Meachum,* 427 U.S. at 216, 96 S.Ct. at 2534 (Due Process Clause does not mandate hearings prior to such transfers). Therefore, absent allegations that conditions at the second institution constituted cruel and unusual punishment, Justice cannot prove that his transfer violated the Constitution.

---

**6.** Plaintiff's complaint contains no allegations that implicate any of the other defendants in his

## VI. Conspiracy

In addition to alleging that the defendants violated his rights under the First, Eighth, and Fourteenth Amendments, Justice also claims that certain of the defendants entered into a conspiracy to violate his constitutional rights and therefore violated 42 U.S.C. § 1985(3). The magistrate judge correctly found that because Justice did not allege any race or other class-based animus, Section 1985(3) was an inappropriate vehicle for his complaints. *See Graham v. Henderson,* 89 F.3d at 82. Therefore, I must dismiss Justice's conspiracy claims.

## VII. Assigned Counsel Request

I deny Justice's renewed request for *pro bono* representation for substantially the same reasons stated by Magistrate Judge Scanlon in his Order of February 17, 1995, dkt. no. 28, which I affirmed on April 25, 1995, dkt. no. 33.

## CONCLUSION

It is therefore

ORDERED that the report-recommendation is approved in part and disapproved in part, as set forth herein, and it is further

ORDERED that plaintiff's motion for summary judgment is denied; plaintiff's renewed request for assigned counsel is denied without prejudice to renewal when a trial date has been set; and defendants' request for summary judgment is granted to the extent that I grant summary judgment dismissing all of plaintiff's claims except those against Hayden and Selsky which allege plaintiff's Fourteenth Amendment claim of procedural improprieties in a disciplinary hearing.[6]