Carlos CESPEDES, Plaintiff,

v.

Thomas A. COUGHLIN, III, Commissioner of New York State Department of Correctional Services; John P. Keane, Superintendent; Charles Greiner, Deputy Superintendent of Security; F. Orengo, Captain; John Doe, Captain; M. Stokes, Lieutenant; Fields, Sergeant; Albelo, Sergeant; and J. Roman, Correctional Officer, Defendants.

No. 90 Civ. 2667 (DNE).

United States District Court, S.D. New York.

Feb. 7, 1997.

Paul Schiff Berman, New York City, for plaintiff.

Dennis C. Vacco, Attorney General of the State of New York (Angela M. Cartmill, Assistant Attorney General, of counsel), New York City, for defendants.

*Opinion & Order*

EDELSTEIN, District Judge.

In April 1990, plaintiff Carlos Cespedes ("Cespedes" or "plaintiff"), an inmate at the Ossining Correctional Facility ("Sing Sing"), in Ossining, New York, brought this action against the above-named defendants, alleging that, while incarcerated at Sing Sing, he was placed into segregated housing without due process in violation of Title 42, United States Code, Section 1983 ("Section 1983"), as well as several unspecified state law claims. Presently before this Court are plaintiff's objections to the recommendations of Magistrate Judge Sharon E. Grubin ("Magistrate Judge Grubin") regarding several pretrial motions. (Report and Recommendations to the Honorable David N. Edelstein, *Cespedes v. Coughlin,* 90 Civ. 2667 (the "Report") (July 21, 1995).) Defendants did not respond to plaintiff's objections.

Plaintiff's objections concern Magistrate Judge Grubin's proposed disposition of a motion for summary judgment brought by defendants Thomas A. Coughlin ("Coughlin"),

John P. Keane ("Keane"), Charles Greiner ("Greiner"), J. Roman ("Roman") and F. Orengo ("Orengo"), as well as plaintiff's cross-motion for partial summary judgment against defendant M. Stokes ("Stokes") and plaintiff's motion to amend his *pro se* complaint to one drafted by plaintiff's counsel. For the following reasons, this Court: (1) grants summary judgment to defendants Keane and Orengo; (2) dismisses *sua sponte* plaintiff's claims against non-moving defendants Stokes and Luis Alvelo ("Alvelo") pursuant to Title 28, United States Code, Section 1915(d); (3) denies plaintiff's motion for partial summary judgment; and (4) grants plaintiff's motion to amend his Complaint.

## BACKGROUND

This Court will first review the events giving rise to this litigation, then describe the findings and recommendations contained in Magistrate Judge Grubin's Report.

### I. Facts

The events giving rise to the instant litigation occurred on February 18, 1989, in Sing Sing housing block A ("block A") (Memorandum of Law in Support of Plaintiff's Motion to Amend the Complaint and for Partial Summary Judgment and in Opposition to Defendants' Motion for Partial Summary Judgment, *Cespedes v. Coughlin*, 90 Civ. 2667 ("Pltf. Memo") at 3 (Oct. 27, 1992).) At that time, Cespedes was incarcerated in block A. (Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction, *Cespedes v. Coughlin*, 90 Civ. 2667 ("Dfts. PI Opp. Memo") at 3 (Oct. 11, 1990).)

At approximately 5:00 p.m. on February 18, 1989, a prisoner was doused with hot oil while in his cell in block A. *Id.;* (Defendants' Local Rule 3(g) Statement, *Cespedes v. Coughlin*, 90 Civ. 2667 ("Dfts. Rule 3(g) Stmt.") ¶ 14 (Aug. 12, 1991).) Prison officials, including defendant Stokes, conducted an investigation of the incident and were told by a confidential informant that Cespedes had participated in the assault, possibly in conjunction with an undetermined number of other inmates. (Memorandum of Law in Support of Defendants' Motion for Summary

Judgment, *Cespedes v. Coughlin*, 90 Civ. 2667 ("Dfts. SJ Memo") at 2 (Sept. 12, 1991)); (Pltf.Memo at 3); (Dfts. Rule 3(g) Stmt. ¶ 15); (Affidavit of J. Fields in Support of Defendants' Partial Motion for Summary Judgment, *Cespedes v. Coughlin*, 90 Civ. 2667 ("Fields Aff.") ¶ 6 (Aug. 14, 1991).) Based upon the confidential information, defendant J. Fields ("Fields") and other officials searched Cespedes' cell, and discovered a half-filled bottle of baby oil and a flammable spray. (Dfts. SJ Memo at 2); (Dfts. Rule 3(g) Stmt. ¶ 17.)

In light of the evidence against Cespedes, on February 18, 1989, Cespedes was charged with assault in a misbehavior report prepared by defendant Roman, a Corrections Officer. (Affidavit of Tigran Eldred, *Cespedes v. Coughlin*, 90 Civ. 2667 ("Eldred Aff.") at Exh. 1 (Oct. 23, 1992); (Pltf.Memo at 3.) Fields then ordered Cespedes to be brought to Sing Sing's Special Housing Unit ("SHU") pending the commencement of disciplinary proceedings against him. (Pltf.Memo at 3.) According to regulations promulgated by the New York Department of Correctional Services (the "DOC"),

> [a] *special housing unit (SHU),* in maximum security facilities as well as in designated medium security facilities, shall consist of single-occupancy cells grouped so as to provide separation from the general [prison] population, and may be used to house inmates confined to such units pursuant to Part 301 of this Title as well as other inmates as approved by the commissioner or his designee.

N.Y.Comp.Codes R. & Regs. tit. 7, § 300.2 (1991) (emphasis in original). In addition to being separated from the general prison population, SHU inmates are limited in the prison-issue items and personal belongings which they may possess. *Id.* § 302.2. SHU prisoners are also limited in their shower and exercise privileges. *McCann v. Coughlin*, 698 F.2d 112, 117 n. 5 (2d Cir.1983).

In addition to disciplinary admissions (described below), inmates may be admitted to the SHU for several other reasons, including, *inter alia*, detention prior to a hearing or upon receipt from another correctional facility if the inmate's record raises reasonable

questions concerning his willingness to comply with prison rules, N.Y.Comp.Codes R. & Regs. tit. 7, § 301.3(a)(1)–(2); administrative segregation if prison officials determine that the inmate's presence in the general prison population would pose a threat to the safety and the security of the facility, *id.* § 301.4; the inmate's protection, *id.* § 301.5; and "keeplock" admissions for various reasons, such as confinement to await disposition of a disciplinary hearing. *Id.* § 301.6(a).

On February 20, 1989, a corrections officer served Cespedes with a copy of the misbehavior report accusing him the assault, (Defendants' Notice of Motion for Partial Summary Judgment, *Cespedes v. Coughlin*, 90 Civ. 2667 ("Dfts. Notice of Motion") at Exh. C (Aug. 12, 1991)), and on February 24, 1989, Cespedes received a Spanish translation of his misbehavior report. (Pltf. Memo at 3.) While in SHU awaiting his hearing, Cespedes claims that he met with defendant Alvelo, "a Correction Sergeant who was appointed to assist [Cespedes] in preparation of his defense." *Id.* Cespedes contends that he asked Alvelo to "interview and obtain statements from numerous inmates who could provide exculpatory information about the incident, as well as from the correction officer who had issued [Cespedes'] misbehavior report." *Id.* at 4. Cespedes further requested that Alvelo "provide him with legal material, including books, that would explain the law relevant to [his] pending ... [h]earing." *Id.* Cespedes maintains, however, that Alvelo "completely failed to assist [Cespedes] whatsoever, including failing to performing [sic] any of the requested tasks or to meet with [Cespedes] at any other time prior to the proceeding." *Id.*

On February 24, 1989, Sing Sing's disciplinary secretary, A. Adell ("Adell"), wrote to the DOC's central office in Albany and requested an adjournment of Cespedes' hearing. *Id.* at 3; (Dfts. Notice of Motion at Exh. F.) Adell notified the DOC that Cespedes was confined to his cell, that his hearing had not yet commenced, that he had been served with his Spanish language copy of his misbehavior report on the seventh day of his SHU confinement, and that he wanted assistance which would be unavailable until February 27, 1989. *Id.* The DOC consented to Adell's request, and ordered that Cespedes' hearing be completed by March 3, 1989. *Id.*

On February 27, 1989, Cespedes wrote to Sing Sing's Deputy Superintendent for Security, defendant Greiner. (Dfts. Notice of Motion at Exh.E); (Memorandum of Law in Support of Defendants' Motion for Summary Judgment, *Cespedes v. Coughlin*, 90 Civ. 2667 ("Dfts. SJ Memo") at 3 (Sept. 12, 1991).) In his letter to Greiner, Cespedes contended that he had been wrongly accused of the assault, and that he should not have been placed in SHU. *Id.* Cespedes also wrote that, although nine days had elapsed since his SHU confinement began and he had received a misbehavior report, his disciplinary hearing had not yet been held. *Id.* at 3–4.

On February 28 and 30, 1989, defendant Stokes conducted a Tier III disciplinary hearing to adjudicate the assault charges against Cespedes. (Dfts. PI Opp.Memo at 3); (Dfts.Rule 3(g) Stmt. ¶¶ 6, 23); (Eldred Aff. at Exhs. 4 & 5.) New York provides for three "tiers" of disciplinary hearings. N.Y.Comp.Codes R. & Regs., tit. 7, § 270.3(a). A Tier I, or violation hearing, can result in a maximum penalty of loss of certain privileges for up to thirteen days or imposition of one additional work task for a maximum of seven days. *Id.* § 252.5(a). In a Tier II hearing, the hearing officer can discipline an inmate within a range of penalties, including confinement to the SHU for up to thirty days, but may not impose a loss of good time. *Id.* § 253.7(a). In a Tier III hearing, the hearing officer can impose the most severe penalties, including confinement to the SHU for a term limited only by the length of the inmate's overall sentence of incarceration, *id.* § 254.7(a)(3), and the loss of a specified period of good time credits. *Id.* § 254.7(a)(6).

At Cespedes' Tier III hearing, Stokes received the testimony of defendants Roman and Fields. (Dfts. SJ Memo at 4.) Fields testified that a confidential informant told him that Cespedes had assaulted an inmate, while Roman testified that Cespedes was not in his cell when the assault occurred. *Id.* Cespedes testified at the hearing that he was speaking with other prisoners when the as-

sault took place, and that he had no involvement in the incident. *Id.;* (Pltf.Memo at 4.) Cespedes' version of the events was corroborated by the testimony of two witnesses whom Cespedes called to testify on his behalf, inmates Puentes and Diaz. (Dfts. PI Opp. Memo at 3.)

In view of the evidence presented to him, on March 3, 1989, Stokes determined that Cespedes had committed the assault. In rendering this decision, Stokes "held that correction officer Roman had credibly testified that Cespedes was not in his cell at the time of the assault and [Stokes] accepted Sgt. Fields' statement that a confidential informant had identified Cespedes as the assailant." (Dfts. SJ Memo at 4.) Moreover, Stokes "rejected the testimony of inmates Puentes and Diaz, since [Stokes] had determined that [Puentes and Diaz] could not have spoken with Cespedes[ ] at the time of the assault[ ] because they were in different area [sic]." *Id.* According to Cespedes, "Stokes made no further inquiries into the factual underpinnings of [Fields'] conclusion; for example, he did not inquire as to the name of [Fields'] confidential source, whether the confidential source witnessed the alleged assault, or even whether the confidential source was an inmate, correctional officer or civilian." (Pltf.Memo at 4.) Stokes sentenced Cespedes to one year confinement in SHU, to be reduced to seven months if Cespedes exhibited good behavior. *Id.* Cespedes' sentence also included the loss of one year's "good time credits" and commissary, phone, and package privileges. (Report at 1.)

Also on March 3, 1989, Greiner wrote to Cespedes in response to Cespedes' letter. (Dfts. Notice of Motion at Exh. H); (Dfts. SJ Memo at 4.) Greiner informed Cespedes that his disciplinary hearing was timely because "[o]n [February 24, 1989,] [the] Albany [DOC] granted an extension for your Tier III hearing to be completed [on March 3, 1989] [and] Lt. Stokes completed this Tier III hearing by [March 3, 1989]." *Id.* at 4–5.

Cespedes appealed Stokes' findings and sentence to the DOC. (Eldred Aff. at Exh. 7); (Dfts. PI Opp.Memo at 4.) Cespedes alleged that Stokes was not a fair and impartial hearing officer because Stokes had also investigated the charges against Cespedes prior to the hearing. (Dfts. PI Opp.Memo at 4.) Cespedes also complained that Stokes improperly accepted Fields' testimony that a confidential informant had implicated Cespedes in the assault. *Id.* On May 19, 1989, Donald Selsky ("Selsky"), the DOC's Director of Special Housing/Inmate Discipline, overturned Cespedes' sentence. (Dfts. SJ Memo at 5); (Dfts. Notice of Motion at Exh. B); (Dfts. SJ Memo at 5); (Eldred Aff. at Exhs. 8 & 9.) Selsky found that there had been a "procedural error" in Cespedes' adjudication, (Dfts. PI Opp.Memo at 4), because the

> [h]earing officer was determined to have been involved in the investigation as he wrote the misbehavior report on another inmate who acted in concert with the inmate charged [ (Cespedes) ]. [There was] [n]o indication that [the] hearing officer made an independent assessment of the reliability of the confidential source [and] [n]o documentation as to why witnesses were not interviewed in the inmate's presence.

(Dfts. Notice of Motion at Exh. B); (Dfts. SJ Memo at 5); (Eldred Aff. at Exhs. 8 & 9.)

On May 25, 1989, Sing Sing officials received a copy of Selsky's reversal order. (Dfts. PI Opp.Memo at 5.) The next day, Sing Sing's disciplinary office and Inmates Records Coordinator received the order. *Id.* According to Cespedes, once he received notice of Selsky's reversal, he told defendants Keane and Orengo that he should be immediately released from SHU. (Dfts. PI Opp.Memo at 4.) Cespedes claims that, despite his demands, he was not released from SHU until June 2, 1989. *Id.;* (Plaintiff's Objections to Report and Recommendation, *Cespedes v. Coughlin,* 90 Civ. 2667 ("Pltf.Objs.") at 7–8 (Aug. 9, 1995).) Defendants dispute plaintiff's version of these facts, and contend that they were not aware that plaintiff remained in SHU after his sentence was reversed. (Affidavit of John P. Keane in Support of Defendant's Motion for Partial Summary Judgment, *Cespedes v. Coughlin,* 90 Civ. 2667 ("Keane Aff.") ¶¶ 11–16 (Aug. 13, 1991).)

On April 20, 1990, Cespedes was permitted to commence the instant lawsuit *in forma pauperis.* (Order, *Cespedes v. Coughlin,* 90 Civ. 2667 (April 20, 1990).) In his *pro se* Complaint filed that same day, Cespedes sets forth a Section 1983 federal claim as well as unspecified state law claims. (Complaint, *Cespedes v. Coughlin,* 90 Civ. 2667 ("Complaint") at 3 (April 9, 1990).) Cespedes' Section 1983 cause of action alleges that "[t]he acts of defendants acting under color of state law, and each of them, deprived plaintiff of liberty without due process of law in violation of the Fourteenth Amendment to the United States Constitution." *Id.* Specifically, he alleges, *inter alia,* that: (1) Stokes was not a fair and impartial hearing officer at his Tier III hearing; (2) Alvelo failed to provide plaintiff with proper assistance at his hearing; and (3) Keane and Orengo improperly allowed plaintiff to remain confined in SHU after learning that plaintiff's hearing disposition had been reversed. (Report at 2); *see* (Complaint at 3 & Exh. A.) Cespedes' state claims arise from two allegations in his Complaint: (1) that his SHU confinement "caused him physical and psychic suffering ... [and] emotional distress"; and (2) that his treatment "violated certain rights guaranteed to [plaintiff] by New York law." *Id.* As a result of these allegations, Cespedes demands: (1) punitive damages in the amount of $50,000; (2) compensatory damages in the amount of $100 for each day he spent in SHU; (3) reasonable costs and attorneys' fees; (4) a "preliminary and permanent injunction enjoining defendants from commencing further disciplinary action arising out of the underlying incidents"; and (5) "such other further relief as may be just." *Id.* at 4.

The procedural history of the instant case is somewhat complex, and has been inordinately drawn out. On May 9, 1990, this case was referred for assignment to a magistrate judge, (Order, *Cespedes v. Coughlin,* 90 Civ. 2667 (May 9, 1990)), and on that same day Magistrate Judge Grubin was assigned to it. (Notice of Case Assignment, *Cespedes v. Coughlin,* 90 Civ. 2667 (May 9, 1990).) On September 12, 1991, defendants moved for summary judgment. (Report at 3.) On September 25, 1991, Magistrate Judge Grubin placed the instant case on the suspense calendar pending the appointment of counsel for Cespedes from the Pro Bono Panel of the United States District Court for the Southern District of New York. *Id.*; (Order, *Cespedes v. Coughlin,* 90 Civ. 2667 (Sept. 25, 1991).) On August 5, 1992, Cespedes was appointed counsel. (Notice of Attorney Appearance, *Cespedes v. Coughlin,* 90 Civ. 2667 (Aug. 5, 1992).) On October 28, 1992, Cespedes filed papers in opposition to defendants' motion for summary judgment, as well as a motion to amend his Complaint and for partial summary judgment against defendant Stokes. Defendants filed their reply papers in support of their motion for summary judgment and their opposition to plaintiff's motions on December 8, 1992. On December 21, 1992, plaintiff submitted his reply in support of his motion for partial summary judgment and to amend his Complaint.

On April 12, 1993, Magistrate Judge Grubin ordered this case's removal from the suspense docket. (Order, *Cespedes v. Coughlin,* 90 Civ. 2667 (April 12, 1993).) Pursuant to a Stipulation and Order, on September 17, 1993, Magistrate Judge Grubin held discovery in this case in abeyance pending the determination of the parties' respective motions. (Report at 4); (Order, *Cespedes v. Coughlin,* 90 Civ. 2667 (Sept. 17, 1993).) Her consideration of the motions was further delayed by consent of the parties pending the Second Circuit's decision on a petition for rehearing in a case apparently controlling some of the issues presented in the case at bar. (Report at 4.) On October 6, 1994, defendants Roman and John Doe, neither of whom were ever served with plaintiff's Complaint, were dismissed with prejudice from this action. (Notice of Voluntary Dismissal, *Cespedes v. Coughlin,* 90 Civ. 2667 (Oct. 6, 1994).)

On July 27, 1995 Magistrate Judge Grubin issued her Report regarding the parties' motions. On August 9, 1995, plaintiff submitted his objections to the Report. (Pltf.Objs. at 14.) On August 10, 1995, defendants' requested additional time to respond to plaintiff's objections. (Letter from Angela M. Cartmill, Assistant Attorney General for the State of New York, to the Honorable David N. Edelstein, United States District Judge

for the Southern District of New York (Aug. 10, 1995).) On August 28, 1995, this Court rejected defendants' application for an extension of time as violative of this Court's Individual Rules. (Memorandum Endorsement, *Cespedes v. Coughlin,* 90 Civ. 2667 (Aug. 28, 1995).)

Finally, on February 5, 1997, this Court signed a stipulation of voluntary dismissal of claims against defendants Coughlin, Greiner and Fields. (Order, *Cespedes v. Coughlin,* 90 Civ. 2667 (Feb. 5, 1997).) As a result, there are only four defendants remaining in this litigation: Keane, Orengo, Stokes and Alvelo.

## II. MAGISTRATE JUDGE GRUBIN'S REPORT & PLAINTIFF'S OBJECTIONS

There are three motions underlying Magistrate Judge Grubin's Report to this Court. Defendants Coughlin, Greiner, Fields, Keane and Orengo filed a joint motion for summary judgment. Cespedes submitted a cross-motion for partial summary judgment against Stokes and a motion to amend his *pro se* complaint to one drafted by his counsel.

In light of a recent United States Supreme Court decision, *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), which was handed down after the parties' respective submissions concerning the instant motion were filed, Magistrate Judge Grubin recommended not only that this Court grant defendants' summary judgment motion, but also that this Court grant summary judgment *sua sponte* to the remaining two defendants in this litigation, Stokes and Alvelo. (Report at 8.) Alternatively, Magistrate Judge Grubin suggested that this Court "dismiss all claims against [Stokes and Alvelo] pursuant to th[is] [C]ourt's inherent authority to do so under 28 U.S.C. § 1915(d) without requiring the formality of a motion as [those claims] are 'frivolous' within the meaning of that provision." *Id.* In light of her finding that plaintiff's claims are meritless, Magistrate Judge Grubin stated that "[o]bviously, plaintiff's motion to amend the complaint and his motion for partial summary judgment should be denied." *Id.* at 9. In addition, Magistrate Judge Grubin notes that because Cespedes' proposed amended Complaint drops his state law claims, if this Court permits him to amend his Complaint, "the retention of supplemental jurisdiction over plaintiff's state law claims is not warranted." *Id.* 9 n. 3.

Plaintiff's objections to Magistrate Judge Grubin's Report all center on her interpretation of the Supreme Court's *Sandin* decision. First, plaintiff argues that *Sandin* "has no application to prison disciplinary proceedings at which inmates may lose good time credits." (Pltf.Objs. at 2.) Second, plaintiff claims that Magistrate Judge Grubin's Report "fails to recognize that the amount of process due in any particular case must be based upon the maximum penalty that may be imposed, rather than the actual penalty imposed." *Id.* at 3. Third, plaintiff asserts that the length of his SHU confinement raises material issues of fact regarding whether he suffered "atypical and significant hardship" under *Sandin. Id.* at 7. Finally, plaintiff contends that, under *Sandin,* a factual record must be developed regarding the degree of his restraint while in SHU in relation to "the ordinary incidents of life in New York correctional facilities." *Id.* at 11. As noted above, defendants did not respond to plaintiff's objections.

## DISCUSSION

Before resolving the issues currently before it, this Court first must set forth the legal principles which govern the instant opinion.

### I. RELEVANT LEGAL STANDARDS

The relevant legal standards for purposes of the instant opinion are those which govern: (1) a district court's review of a magistrate judges's recommendation; (2) a motion for summary judgment; and (3) a claim pursuant to Section 1983.

### A. Standard for Reviewing a Magistrate's Recommendation

Magistrate judges are empowered by statute to preside over pretrial matters on appointment by a district judge. 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.P. 72. Where, as here, a Magistrate Judge is "assigned with-

out consent of the parties to hear a pretrial matter dispositive of a claim or defense of a party or a prisoner petition challenging the conditions of confinement ... [t]he magistrate judge shall enter into the record a recommendation for disposition of the matter, including proposed findings of fact where appropriate." Fed.R.Civ.P. 72(b).

▇ Under Federal Rule of Civil Procedure ("Rule") 72(b), and Title 28, United States Code, Section 636(b)(1)(A), a district court evaluating a magistrate judge's recommendation is permitted to adopt those portions of the recommendation to which no specific objection is made, as long as those sections are not clearly erroneous. *Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 471–72, 88 L.Ed.2d 435 (1985); *see also Ehinger v. Miller,* 942 F.Supp. 925, 927 (S.D.N.Y. 1996); *Washington v. Lenihan,* 87 Civ. 4770, 1996 WL 345950 (S.D.N.Y. June 21, 1996). Where a party makes a "specific written objection" within "[ten] days after being served with a copy of the [magistrate judge's] recommended disposition," Fed. R.Civ.P. 72(b), however, the district court is required to make a *de novo* determination regarding those parts of the report. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 2412–13, 65 L.Ed.2d 424 (1980).

▇ The term *"de novo* determination" has "an accepted meaning in the law. It means an independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *Id.* at 690, 100 S.Ct. at 2419 (Stewart, J., dissenting); *see also Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988). Therefore, *de novo* review "means reconsideration afresh by the district judge in this sense: no presumption of validity applies to the magistrate's findings or recommendations." 7 Pt. 2 James Wm. Moore, Moore's Federal Practice, ¶ 72.04[10.–2], at 72–96 (1995). If the district court disagrees with the magistrate judge's proposals, or any part of them, the judge is free to substitute his own view for that of the magistrate judge without any threshold finding whatsoever. *Id.* However, while the district court is not required to conduct a new hearing regarding a party's objections to the magistrate judge's recommendations, it is required to review the record of the proceedings before the magistrate judge. *Id.* at ¶ 72.04[10.–2], at 72–98.

▇ In addition, "the district judge retains the power to engage in *sua sponte* review of any portion of the magistrate's report and recommendation, regardless of the absence of objections." 7 Pt. 2 Moore's Federal Practice, ¶ 72.04[10.–1], at 72–95. Such *sua sponte* review "may be under a *de novo* standard, or any lesser standard of review." *Id.* In making its review, "[t]he district judge may accept, reject or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b).

Because plaintiff timely filed objections to the Report, this Court is required to undertake a *de novo* review of the motions underlying Magistrate Judge Grubin's Report. Fed.R.Civ.P. 72(b).

### B. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure ("Rule") 56, summary judgement is appropriate where "the pleadings, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The movant may discharge this burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case on an issue which that party would have the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). As the Second Circuit has noted, "[i]t has long been the rule that on summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion." *Lendino v. Trans Union Credit*

*Info. Co.*, 970 F.2d 1110, 1112 (2d Cir.1992) (quotation omitted).

To defeat a motion for summary judgment, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e); *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356. If the adverse party does not respond to the motion for summary judgement, "summary judgement, if appropriate, shall be entered against the adverse party." Fed.R.Civ.P. 56(e).

■ In considering a motion for summary judgment, a court is not to resolve contested issues of fact, but rather, it is to determine the existence of any disputed issues of material fact. *Knight v. United States Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The existence of a genuine issue of material fact depends on both the genuineness and the materiality of the issues raised by the motion. *See Scottish Air Int'l, Inc v. British Caledonian Group*, 867 F.Supp. 262, 266 (S.D.N.Y.1994), *aff'd*, 81 F.3d 1224 (2d Cir.1996). Indeed, "the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985) (per curiam). To evaluate a fact's materiality, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). While "disputes over facts that might affect the outcome of a suit under the governing law will properly preclude the entry of summary judgment[,] [f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citations omitted); *see Knight*, 804 F.2d at 11–12. According to the Supreme Court, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a judge or jury to resolve the parties'

differing versions of the truth at trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510 (quotation omitted).

### C. Section 1983 Standard

When Congress passed Section 1983, it created "a civil cause of action against any person who, acting pursuant to state government authority or under the color of state law, abridges rights secured by the United States Constitution or by any federal law." *Campo v. Keane,* 913 F.Supp. 814, 818 (S.D.N.Y.1996) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924, 102 S.Ct. 2744, 2747, 73 L.Ed.2d 482 (1982)). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir.1993), *cert. denied*, 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994) (citation omitted); *Morris v. Dann*, No. 95–CV–975, 1996 WL 732559, at *3 (N.D.N.Y. Dec. 11, 1996) (citations omitted).

■ In order to prevail on a claim under Section 1983, a plaintiff must prove that the defendant(s) (1) acted under color of state law, (2) in a manner that deprived the plaintiff of "any rights, privileges or immunities secured by the Constitution." 42 U.S.C. § 1983; *see Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986); *Eagleston v. Guido*, 41 F.3d 865, 876 (2d Cir.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 53, 133 L.Ed.2d 18 (1995); *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993).

Having articulated the legal standards which control this Opinion, this Court may now set about its review of the issues underlying Magistrate Judge Grubin's Report. As noted above, this Court must do so pursuant to a *de novo* standard of review.

### II. THIS COURT'S DE NOVO REVIEW OF THE ISSUES UNDERLYING MAGISTRATE JUDGE GRUBIN'S RECOMMENDATIONS

Magistrate Grubin made five recommendations to this Court: (1) that this Court grant

defendants' motion for summary judgment; (2) that this Court *sua sponte* grant summary judgment to defendants Stokes and Alvelo, or, alternatively, *sua sponte* dismiss claims against them under Title 28, United States Code, Section 1915(d); (3) that this Court deny Cespedes' motion for partial summary judgment with respect to defendant Stokes; (4) that this Court deny Cespedes' motion to amend his Complaint to drop his state law claims; and (5) that this Court permit Cespedes to pursue his state law claims in state court because, "upon dismissal of all claims over which this [C]ourt has original jurisdiction, the retention of supplemental jurisdiction is not warranted." (Report at 9 n. 3.) Each of these issues will be considered in turn, as this Court conducts its *de novo* review of the parties' respective motions underlying Magistrate Judge Grubin's Report.

### A. Defendants Keane and Orengo's Motion for Summary Judgment

Five defendants initially moved for summary judgment. However, as explained above, three of those defendants—Coughlin, Greiner and Fields—were voluntarily dismissed from this litigation. Consequently, defendants Keane and Orengo are the only remaining defendants whose motion for summary judgment is presently before this Court. In their motion, Keane and Orengo argue that Cespedes' confinement did not deprive him of due process and, alternatively, that their involvement in the events underlying Cespedes' claim was insufficient to deprive Cespedes of due process. (Dfts. SJ Memo at 12–15). In opposition to Keane and Orengo's motion for summary judgment, Cespedes asserts that there is a genuine issue of material fact regarding their involvement in Cespedes' SHU confinement. (Pltf.Memo at 19–23.) In reaching her conclusion that defendants did not deprive Cespedes of due process, Magistrate Judge Grubin relied upon *Sandin*, a decision which was unavailable to the parties at the time they submitted their respective papers concerning defendants' motion for summary judgment. (Report at 6–8.) For the following reasons, this Court also finds it appropriate to base its decision regarding defendants' motion for summary judgment on *Sandin*.

It is undisputed that defendants in the instant case acted pursuant to their authority as prison officials under color of New York state law. The only unresolved question in Cespedes' Section 1983 case, therefore, is whether defendants acted in a manner which deprived Cespedes of any "rights, privileges or immunities secured by the United States Constitution." 42 U.S.C. § 1983. Cespedes' Section 1983 action alleges that his procedural due process rights were violated during a disciplinary hearing which resulted in a one-year sentence to SHU confinement and a recommended one-year loss of good time credit. However, before this Court can consider whether Cespedes' allegations constitute a violation of his rights to procedural due process, it must first determine whether freedom from SHU confinement and good time credit constitute protected liberty interests.

The Fourteenth Amendment to the United States Constitution provides that a state may not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. It is well-settled that, once lawfully convicted and incarcerated, a prisoner has a restricted range of protected liberty interests. The Supreme Court has explained that a lawfully convicted prisoner is "constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976).

In order to prevail in an action based on Section 1983 and the Fourteenth Amendment, a prison inmate must demonstrate a deprivation of a liberty interest protected by the Due Process Clause itself, or a violation of a state-created liberty interest. *See Morris v. Dann*, No. 95–CV–975, 1996 WL 732559, at *3 (N.D.N.Y. Dec. 11, 1996). Cases of the first category—those in which the Due Process Clause has been found to apply by its own force—involve deprivations of a prisoner's life, liberty, or property much

more severe than the allegations advanced by Cespedes. *See, e.g., Washington v. Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (forced ingestion of antihypnotic drugs into prisoner); *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (involuntary commitment of prisoner to mental health facility); *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973) (revocation of probation status to compel return to prison); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole to compel return to prison). As demonstrated by these cases, inherent due process protection has been found to arise where there is an invasion of a prisoner's bodily integrity, involuntary alteration of a prisoner's mental treatment, or where there is a revocation of a prisoner's complete release from institutional life. As the Supreme Court has observed, "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). Because this Court is presented with nothing which suggests that Cespedes' punishment approaches this level of severity, this Court finds that the Due Process Clause does not, of its own force, provide Cespedes a cause of action arising from his allegations.

As a result, if Cespedes is to succeed, it will be because he can establish a deprivation of a state-created liberty interest. The circumstances under which inmates are afforded a state-created liberty interest protected by the Due Process Clause recently were reconfigured by the Supreme Court in *Sandin.*

■ Before considering *Sandin's* impact upon prisoners' state-created procedural due process claims, this Court notes that *Sandin* applies retroactively to the case at bar. *Uzzell v. Scully,* 893 F.Supp. 259, 263 n. 8 (S.D.N.Y.1995). Retroactive application of judicial precedent is a well-established jurisprudential practice. *See Solem v. Stumes,* 465 U.S. 638, 642, 104 S.Ct. 1338, 1341, 79 L.Ed.2d 579 (1984) ("[a]s a rule, judicial decisions apply 'retroactively' "). This practice flows directly from our common law tradition, for "a legal system based on precedent has a built-in presumption of retroactivity." *Id.* at 642, 104 S.Ct. at 1341; *see also Landgraf v. USI Film Products,* 511 U.S. 244, 272–74, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994).

### 1. *Sandin's Impact on Prisoners' State–Created Procedural Due Process Rights*

*Sandin* reversed a trend toward expanding a prisoner's constitutionally-protected liberty interests. *See Delaney v. Selsky,* 899 F.Supp. 923, 925 (N.D.N.Y.1995). In *Sandin,* Conner, a prisoner who was serving an indeterminate sentence of thirty years to life in a Hawaii prison brought a Section 1983 action against prison officials. 515 U.S. at ——, 115 S.Ct. at 2297. Conner had been charged by prison officials both with "high misconduct" and "low moderate misconduct." *Id.* at ——, 115 S.Ct. at 2296. In his lawsuit, Conner alleged that the defendants, members of the prison's "adjustment committee" which presided over his disciplinary hearing on the charges against him, deprived him of procedural due process by refusing to allow him to present witnesses at his hearing, and by sentencing him to disciplinary segregation for thirty days. *Id.* at ——, 115 S.Ct. at 2296. Chief Justice Rehnquist, writing for five members of the Court, held that neither the state prison regulations nor the Due Process Clause itself afforded Conner a protected liberty interest that entitled him to the procedural protections due prisoners under *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Sandin,* 515 U.S. at —— – ——, 115 S.Ct. at 2302–03.

In reaching this conclusion, the *Sandin* Court first noted that, under *Wolff,* states may, in certain circumstances, create liberty interests which are protected by the Due Process Clause. *Id.* at ——, 115 S.Ct. at 2300. *Wolff* held that the Due Process Clause itself does not create a liberty interest, but that a state's statutory provision may do so if the interest it establishes is one of "real substance." 418 U.S. at 557, 94 S.Ct. at

2975. In that case, for example, Justice White held that a Nebraska state statute created a liberty interest in a prisoner's shortened prison sentence resulting from "good time credits" that are revocable only for serious misconduct. *Id.* Where such an interest exists, *Wolff* sets forth the procedural protections to which prisoners are due.

In *Sandin*, Chief Justice Rehnquist further explained that, because the state-created liberty interest recognized in *Wolff* was predicated on Nebraska's statute, subsequent decisions continued that practice, and, over time, the Court intensified its focus on specific statutory language in determining the existence of prisoners' liberty interests. *Sandin*, 515 U.S. at ——, 115 S.Ct. at 2297; *see Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (where inmates challenged transfer to another prison, the Court distinguished *Wolff* by noting that no state law stripped prison officials' ability to transfer inmates); *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1, 11, 99 S.Ct. 2100, 2105–06, 60 L.Ed.2d 668 (1979) (where statute stated that inmates "shall" be paroled unless one of four conditions were shown, the statute created a legitimate expectation of release that warranted constitutional protection); *Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) (in evaluating claims of inmates who had been confined to administrative segregation, the Court determined that the state had created a protected liberty interest by issuing prison guidelines with "language of an unmistakably mandatory character"); *Olim v. Wakinekona*, 461 U.S. 238, 249–50, 103 S.Ct. 1741, 1747–48, 75 L.Ed.2d 813 (1983) (based on discretionary language of prison regulation, the Court found that no particular type of hearing was required prior to interstate prisoner transfer); *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 464–65, 109 S.Ct. 1904, 1910–11, 104 L.Ed.2d 506 (1989) (where a regulation left the exclusion of prison visitors to the prison officials' discretion, the Court found that the regulation did not create a protected liberty interest).

*Sandin*, however, explicitly renounced the language-parsing methodology which the Court had come to espouse in *Hewitt*. *Sandin*, 515 U.S. at —— & —— n. 5, 115 S.Ct. at 2299 & 2300 n. 5. Chief Justice Rehnquist observed that "[b]y shifting the focus of the liberty interest to one based on the language of a particular regulation, and not the nature of the deprivation," the Court inadvertently had produced three undesirable results. *Id.* First, the Court's preoccupation with the wording of prison regulations had "encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." *Id.* This methodology, in turn, led lower courts to find liberty interests to be created through the negative implication of mandatory language. *Id.* For example, Chief Justice Rehnquist characterized the Ninth Circuit's decision in *Sandin*—which the Supreme Court overturned—as "inferr[ing] from the mandatory directive that a finding of guilt 'shall' be imposed under certain conditions the conclusion that the absence of such conditions prevents a finding of guilt." *Id.* While this method "may be entirely sensible in the ordinary task of construing a statute defining the rights and remedies available to the general public," the Chief Justice explained, "[i]t is a good deal less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison ... [and] not designed to confer rights on inmates." *Id.*

Second, the *Hewitt* methodology "create[d] disincentives for States to codify prison management procedures in the interest of uniform treatment." *Id.* Finally, "the *Hewitt* approach ha[d] led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." *Id.* Such an undertaking "runs counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." *Id.* (citations omitted). Such flexibility is particularly "warranted in the fine-tuning of prison life, a common subject of prisoner claims since *Hewitt.*" *Id.* (citations omitted).

Dissatisfied with both the formulation and the consequences of *Hewitt,* the *Sandin* majority opined that "[t]he time ha[d] come" to return its focus to the nature of prisoners' liberty deprivation, not the language of prison regulations. *Id.* at ——, 115 S.Ct. at 2300. It is the deprivation of liberty which, after all, is the "the real concern[ ] undergirding the liberty protected by the Due Process Clause." *Id.* In the decision's crucial language, the Court wrote that although it continues to

> recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause ... *these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.*

*Id.* (internal citations omitted) (emphasis added). Focusing on the nature of Conner's 30–day disciplinary confinement in relation to the "overall incidents of prison life," the *Sandin* Court concluded that his "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Sandin,* 515 U.S. at ——, 115 S.Ct. at 2301. Although *Sandin* did not provide detailed guidance for lower courts seeking to apply this new standard, it did note that the Court did "not think a prisoner's subjective expectation [is] dispositive of the liberty interest analysis, [but] it does provide some evidence that the conditions suffered were expected within the contour of the actual sentence imposed." *Id.* at —— n. 9, 115 S.Ct. at 2301 n. 9.

As might be expected, *Sandin* altered Second Circuit precedent dealing with prisoners' procedural due process claims. Prior to *Sandin,* the Second Circuit held that a prison inmates's interest in not being placed in SHU constituted a liberty interest that triggered the procedural protections of the Due Process Clause. *See, e.g., Wright v. Smith,* 21 F.3d 496, 499 (2d Cir.1994); *Matiyn v.*

*Henderson,* 841 F.2d 31 (2d Cir.), *cert. denied,* 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988). After *Sandin,* however, the Second Circuit recognized that "*Sandin* may be read as calling into question the continuing viability of our cases holding that New York regulations afford inmates a liberty interest in remaining free from administrative segregation." *Rodriguez v. Phillips,* 66 F.3d 470, 480 (2d Cir.1995).

More recently, the Second Circuit further construed *Sandin's* impact on prisoners' procedural due process claims, and appeared reluctant to abandon completely its reliance on states' statutes and regulations in determining the existence of prisoners' liberty interests. In *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996) (per curiam), the Second Circuit relied on a footnote in *Sandin* stating that the decision "does not technically require us to overrule any holding of this Court," *Sandin,* 515 U.S. at —— n. 5, 115 S.Ct. at 2300 n. 5, to hold that "nothing in *Sandin* suggests that a protected liberty interest arises in the absence of a particular state regulation or statute that (under *Hewitt* ) would create one." 81 F.3d at 317 (footnote omitted); *accord Quartararo v. Catterson,* 917 F.Supp. 919, 937 (E.D.N.Y.1996) ("the *Sandin* Court suggests that considerations of language remain relevant, although not of itself dispositive"). Accordingly, *Frazier* announced a two-part standard which prisoners must satisfy to establish a procedural due process claim due to segregated confinement:

> To prevail, [plaintiff inmate] must establish *both* that [1] the confinement or restraint creates an 'atypical and significant hardship' under *Sandin, and* that [2] the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint.

*Id.* at 317 (emphasis added). Only by establishing these two elements can a prisoner demonstrate a liberty interest which is entitled to the procedural safeguards of the Due Process Clause. *Luis v. Coughlin,* 935 F.Supp. 218, 221–22 (W.D.N.Y.1995).

The procedural protections owed to a prisoner who successfully meets the *Frazier*

standard are set forth in *Wolff,* 418 U.S. at 564–66, 94 S.Ct. at 2979–80. As previously discussed, *Wolff* is the seminal case in the Supreme Court's recognition that states may, through regulations and statutes, create liberty interests of "real substance." *Id.* at 557, 94 S.Ct. at 2975. It is those liberty interests of real substance from which Supreme Court jurisprudence had departed in cases such as *Hewitt,* but to which it sought to return in *Sandin,* 515 U.S. at ——-——, 115 S.Ct. at 2297–2300. In addition, *Wolff* also articulated the minimum procedures necessary to "reach a mutual accommodation between [prisons'] institutional needs and objectives and the provisions of the Constitution." 418 U.S. at 556, 94 S.Ct. at 2975. *Wolff* thus guarantees three rights to prisoners who establish a protected liberty interest: (1) twenty-four hours notice of the charges against them; (2) a written statement of the evidence relied on by the fact-finder at the hearing; and (3) the reasons for the disciplinary action taken by the hearing officer. *Id.* at 563–65, 94 S.Ct. at 2978–79; *see also Lee v. Coughlin,* 902 F.Supp. 424, 431 (S.D.N.Y.1995). Moreover, inmates facing a disciplinary hearing at which a protected liberty interest is at stake must receive meaningful assistance from a prison employee in presenting a defense, *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988), and the hearing official presiding over the proceeding must be fair and impartial. *Francis v. Coughlin,* 891 F.2d 43, 46–47 (2d Cir.1989).

▉▉▉▉ To summarize the law's present state in this Circuit, a prisoner asserting a Section 1983 claim based on a segregated confinement must prove the existence of a state-created liberty interest protected by the Due Process Clause by establishing two elements: (1) that the confinement creates an "atypical and significant hardship" under *Sandin;* and (2) that the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement. *Frazier,* 81 F.3d at 317. Once a prisoner successfully demonstrates a liberty interest, a court must determine whether prison officials adequately protected that interest by granting the prisoner: (1) twenty-four hours notice of the charges against him; (2) a written statement of the evidence relied on by the fact-finder at the hearing; (3) the reasons for the disciplinary action taken by the hearing officer, *Wolff,* 418 U.S. at 563–65, 94 S.Ct. at 2978–79; (4) meaningful assistance from a prison employee in presenting a defense, *Eng,* 858 F.2d at 895; and (5) a fair and impartial hearing officer, *Francis,* 891 F.2d at 46–47.

In the case at bar, plaintiff had two potential liberty interests at stake at his disciplinary hearing: (1) his confinement in SHU for 104 days; and (2) his loss, and subsequent restoration, of good time credits. This Court will consider each of these issues individually. Only if this Court determines that plaintiff had a protected liberty interest in either of these two issues will it be necessary for this Court to consider whether plaintiff's hearing comported with due process.

### 2. Whether Plaintiff's SHU Confinement Constituted A Protected Liberty Interest

After Cespedes was found guilty of assault, he was sentenced to one year of punitive segregation in SHU, loss of commissary and package privileges, and a loss of one year of good time credits. (Pltf.Memo at 6.) Because his sentence was overturned, Cespedes ultimately spent 104 days in SHU—twelve days prior to his sentence and fourteen days after his sentence's reversal. (Pltf.Objs. at 2 n. 1.) Because this Court addresses Cespedes' loss of good time credits below, this section is concerned solely with the question of whether, in light of *Sandin* and the Second Circuit's interpretation of that decision, Cespedes' SHU confinement constituted a liberty interest that warrants the protections of due process.

To reiterate, in order to determine whether a prisoner has a protected liberty interest in a segregated confinement, a court must find: (1) that the confinement creates an "atypical and significant hardship" under *Sandin;* and (2) that the state has granted its inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement. *Frazier,* 81 F.3d at 317. This Court will consider whether Cespedes satisfies these two elements in order.

As Justice Ginsburg observes in her *Sandin* dissent, the majority opinion "describes a category of liberty interest that is something less than the one the Due process Clause itself shields, something more than anything a prison code provides." *Sandin*, 515 U.S. at —— n. 2, 115 S.Ct. at 2303 n. 2 (Ginsburg, J., dissenting) (internal citations omitted). Justice Ginsburg thus asks, when the *Sandin* majority states that a "State may create a liberty interest . . . when 'atypical and significant hardship [would be borne by] the inmate in relation to the ordinary incidents of prison life' . . . [w]hat design lies beneath these key words?" *Id.* (internal citations omitted). Because the majority "ventures no examples," Justice Ginsburg asserts that *Sandin* "leave[es] consumers of the Court's work at sea, unable to fathom what would constitute an 'atypical, significant deprivation,' and yet not trigger protection under the Due Process Clause directly." *Id.*

As a "consumer of the Court's work," this Court agrees with Justice Ginsburg that if left only with the *Sandin* opinion for guidance, this Court might well be adrift at sea. Thankfully, that is not the case, for while the Second Circuit has to date rendered just one decision relying solely on *Sandin*, *see Frazier*, 81 F.3d at 317–18 (holding that a 12–day prehearing SHU detention and a 30–day close supervision unit detention did not implicate a protected liberty interest), the district courts of this Circuit have issued a great many opinions interpreting *Sandin*, often with wildly varied results. *Compare Kozlek v. Papo*, No. 94 Civ. 1429, 1995 WL 479410, at *1–*2 (S.D.N.Y. Aug. 11, 1995) (ten days confinement not implicate a liberty interest) *with Polanco v. Allan*, No. 93–CV–1498, 1996 WL 250237 (N.D.N.Y. May 6, 1996) (365 days in SHU confinement not implicate a liberty interest).

Nevertheless, the precedent established by these district courts unequivocally demonstrates their virtual refusal to find an atypical and significant hardship arising from a prisoner's confinement, even where the term of confinement is substantial. *See, e.g., Odom v. Keane*, No. 94 Civ. 8032, 1997 WL 3262, at *1 (S.D.N.Y. Jan. 6, 1997) (46 days in keeplock not implicate liberty interest);

*Quartararo v. Catterson*, 917 F.Supp. 919, 937–38 (E.D.N.Y.1996) (fourteen days' SHU confinement did not impose atypical and significant hardship on prisoner); *Benton v. Keane*, 921 F.Supp. 1078, 1079–80 (S.D.N.Y. 1996) (thirty days' SHU confinement not implicate liberty interest); *Duncan v. Keane*, No 93 Civ. 6026, 1996 WL 511573 (S.D.N.Y. Aug. 22, 1996) (58 days' disciplinary keeplock not implicate liberty interest); *Brown v. McClellan*, No. 93–CV–0901E(F), 1996 WL 328209 (W.D.N.Y. June 11, 1996) (two disciplinary confinements of sixty days each not implicate liberty interest); *Guzman v. Kelly*, No. 88–CV–1391(E), 1996 WL 291985 (W.D.N.Y. May 28, 1996) (eight months in SHU not implicate liberty interest); *Trice v. Clark*, No. 94 Civ. 6871, 1996 WL 257578 (S.D.N.Y. May 16, 1996) (150 days in SHU not implicate liberty interest); *Cargill v. Casey*, No. 95–CV–1620, 1996 WL 227859 (N.D.N.Y. May 2, 1996) (30 days in keeplock not implicate liberty interest); *Camacho v. Keane*, No. 95 Civ. 0182, 1996 WL 204483 (S.D.N.Y. April 25, 1996) (40 days in SHU not implicate liberty interest); *White v. Artuz*, No. 94–4592, 1996 WL 84498, at *1 (S.D.N.Y. Feb. 27, 1996) (45 days in protective custody not implicate liberty interest); *Hendricks v. C. Centanni*, No. 92–5353, 1996 WL 67721, at *1, *3 (S.D.N.Y. Feb. 16, 1996) (thirty days in keeplock not implicate liberty interest); *Rivera v. Coughlin*, 92–3404, 1996 WL 22342, at *4 (S.D.N.Y. Jan. 22, 1996) (89 days in keeplock not implicate liberty interest); *Eastman v. Walker*, 895 F.Supp. 31, 35 (N.D.N.Y.1995) (four days' administrative confinement does not implicate liberty interest); *Uzzell v. Scully*, 893 F.Supp. 259, 262–63 (S.D.N.Y.1995) (45 days in keeplock does not implicate a liberty interest); *Carter v. Carriero*, 905 F.Supp. 99, 104 (W.D.N.Y. 1995) (270 days' SHU confinement not implicate a liberty interest); *Brooks v. DiFasi*, No. 93–CV–0197(E)H, 1995 WL 780976, at *5 (W.D.N.Y. Dec. 29, 1995) (180 days' disciplinary confinement in SHU does not implicate a liberty interest); *Rosario v. Selsky*, No. 94 Civ. 6872, 1995 WL 764178, at *5 (S.D.N.Y. Dec. 28, 1995) (less than three months' SHU confinement failed to implicate liberty interest); *Tulloch v. Coughlin*, No. 91–CV–0211E(M), 1995 WL 780970, at *2 (W.D.N.Y.

Dec. 22, 1995) (180' days disciplinary confinement in SHU not implicate liberty interest); *Arce v. Walker*, 907 F.Supp. 658, 661–63 (W.D.N.Y.1995) (confinement to SHU for 19 days, and accompanying loss of exercise privileges, fails to implicate liberty interest); *Martin v. Mitchell*, No. 92–CV–716, 1995 WL 760651, at *3 (N.D.N.Y. Nov. 24, 1995) (thirty days' keeplock confinement not implicate liberty interest); *Jackson v. Keane*, No. 93 Civ. 6453, 1995 WL 622593, at *3 (S.D.N.Y. Oct. 24, 1995) (14 days' segregated confinement does not, without more, implicate liberty interest); *McMiller v. Wolf*, No. 94–CV–0623E(F), 1995 WL 529620, at *1–*3 (W.D.N.Y. Aug. 28, 1995) (confinement to SHU for 183 days failed to implicate liberty interest, even though based on misbehavior report falsely accusing prisoner of misconduct); *Schmelzer v. Norfleet*, 903 F.Supp. 632, 634–35 (S.D.N.Y.1995) (eleven days' confinement to SHU not implicate a liberty interest).

On the other hand, a few courts in this Circuit have found that a material issue of disputed fact exists with respect to whether confinement to SHU for 197 days where the inmate alleged that his conditions of confinement caused him health problems, *Delaney v. Selsky*, 899 F.Supp. 923, 927–28 (N.D.N.Y. 1995), or 376 days' SHU confinement, *Lee v. Coughlin*, 902 F.Supp. 424, 431 n. 9 (S.D.N.Y. 1995), was sufficiently atypical, or imposed so significant a hardship under *Sandin* to create a protected liberty interest. *Cf. Williams v. Fountain*, 77 F.3d 372, 375 n. 3 (11th Cir. 1996) (assuming without deciding that a "full year of solitary confinement" constituted a liberty interest).

In the face of this overwhelming balance of authority, this Court finds that Cespedes' 104 days in SHU confinement clearly was not sufficiently atypical, and did not impose so significant a hardship in relation to the ordinary incidents of prison life as to implicate a liberty interest. Accordingly, this Court need not consider whether the second prong of the Second Circuit's *Frazier* standard— whether a New York statute or regulation granted inmates a protected liberty interest in remaining free from SHU confinement— has been fulfilled.

Cespedes' objections to Magistrate Judge Grubin's Report do not require a different result, because *Sandin* and its progeny specifically discredit his objections. For instance, Cespedes' first argument, that "the process due in a particular case must be based on the maximum penalty that may be imposed, rather than the actual penalty imposed," (Pltf.Objs. at 3), is simply not supported by the case law. This Court's research has located only two cases in this Circuit which have utilized the "potential penalty approach" in applying *Sandin*: *See Justice v. Coughlin*, 941 F.Supp. 1312, 1323–25 (N.D.N.Y.1996) (whether a 180–day SHU sentence which was later reduced to a 120 days implicated a liberty interest "remains for resolution at trial"); *Campo v. Keane*, 913 F.Supp. 814, 821 (S.D.N.Y.1996) (declining to consider whether a 365–day SHU sentence, of which 61 days were served, implicated a liberty interest under *Sandin*). By contrast, all of the cases listed above considered the actual length of the inmates' confinement in rendering their decision that no liberty interests were implicated. Moreover, this Court finds nothing in *Sandin* which would suggest that courts should employ the potential penalty approach. *See Justice*, 941 F.Supp. at 1324 (acknowledging that "*Sandin* contains no discussion of whether the potential or actual penalty imposed on a prisoner should be the benchmark for defining a liberty interest").

Cespedes' second objection, that "inmates in New York State who face the highest level of disciplinary sanctions that can be imposed only in a Tier III hearing have a sufficient liberty interest at stake to invoke the due process protections spelled out in *Wolff*," is similarly refuted by the case law. Because the vast majority of courts which have applied *Sandin* considered the actual sentence imposed upon an inmate, the fact that a Tier III hearing may impose an SHU sentence as long as the prisoner's overall sentence of incarceration does not necessarily implicate a liberty interest, since it is the actual, not the potential, penalty imposed which is determinative. If Cespedes' argument were persuasive, it would mean that every Tier III hearing would implicate a

liberty interest, because each one would have the potential for imposing a severe sentence. That, however, plainly is not the case, as many courts have found no liberty interest to exist in confinement imposed at a Tier III hearing. *See, e.g., Duncan,* 1996 WL 511573, at *1; *Trice,* 1996 WL 257578, at *1; *Camacho,* 1996 WL 204483, at *1; *Rosario,* 1995 WL 764178, at *2. Because this Court finds it proper to consider Cespedes' actual SHU confinement, there is no reason for it to find that a Tier III hearing necessarily implicates a liberty interest.

■ Finally, Cespedes' third objection—that this Court should permit him to develop a factual record "regarding the types of restrictive confinement in New York facilities generally and Sing Sing ... in particular," (Pltf.Objs. at 11.)—also finds no support in precedent. The case law suggests that it is the length of SHU confinement which is the crucial consideration, particularly where the inmate has alleged no particular hardship other than the term of confinement itself. *See Justice,* 941 F.Supp. at 1323 (listing cases); *see also Duncan,* 1996 WL 511573, at *3–*4. Cespedes alleges no hardship other than the length of his confinement, and this Court finds no reason to depart from those cases holding that the length of confinement is dispositive absent such an allegation. Moreover, even if he had alleged that the conditions of disciplinary SHU confinement implicated a liberty interest, that claim, too, is refuted by precedent. At least one court has held that the conditions of disciplinary SHU confinement simply do not impose an atypical and significant hardship because New York law permits SHU confinement under substantially the same conditions for many reasons other than discipline. *Rosario,* 1995 WL 764178, at *4 (Mukasey, J.) ("[u]nder *Sandin,* there is no 'atypical and significant hardship' in disciplinary confinement if inmates placed in SHU for non-disciplinary reasons are subject to comparable restrictions," as they are in New York.) Finally, other courts specifically have held that SHU confinement at Sing Sing implicates no liberty interest. *See, e.g., Benton,* 921 F.Supp. at 1078–80; *Duncan,* 1996 WL at *1–*2; *Camacho,* 1996 WL 204483, at *1–*3. As a result, this Court finds that Ces-

pedes' argument seeking to develop a factual record concerning the conditions in New York's prison facilities, and Sing Sing in particular, is meritless.

To reiterate, in order for Cespedes to set forth a Section 1983 claim based on his 104–day SHU confinement, he must demonstrate that his confinement constituted an atypical and significant hardship and that New York provided him a liberty interest. In order to grant summary judgment, this Court must find that no disputed issue of material fact exists with respect to these issues. *Knight,* 804 F.2d at 11. In the case at bar, this Court finds that, under *Sandin,* Cespedes' 104–day SHU confinement did not constitute an atypical and significant hardship. Accordingly, this Court finds that Cespedes cannot set forth a Section 1983 claim based on his confinement. As a result of this Court's *de novo* review of the facts and controlling law of the instant case, this Court finds that defendants Keane and Orengo's motion for summary judgment based on Cespedes' 104–day confinement should be granted.

### 3. Whether Plaintiff's Temporary Loss of Good Time Credits Deprived Him of Due Process

In addition to spending 104 days in SHU confinement, plaintiff also was sentenced to a loss of one year of good time credits. Those credits, however, were administratively reinstated by prison officials shortly after they were taken away. The second issue before this Court in considering whether to grant defendants Keane and Orengo's motion for summary judgment is whether the loss, and subsequent reinstatement, of plaintiff's good time credits deprived plaintiff of due process.

As this Court discussed above, the ability of a prison inmate to assert a Section 1983 claim for a violation of procedural due process has been sharply curtailed by *Sandin.* Even so, if this Court were confronted with a case in which an inmate had his good time credits taken away, and that loss of credit resulted in his serving a longer overall sentence of incarceration, this Court would be compelled to find that a liberty interest pro-

tected by the Due. Process Clause is implicated under the Supreme Court's holding in *Wolff*, 418 U.S. at 557, 94 S.Ct. at 2975.

 This case, however, is not nearly so straightforward. Here, while Cespedes was initially sentenced to a loss of one year's good time credits, those credits later were completely reinstated when his entire sentence was administratively reversed on appeal. Cespedes' claim, therefore, is not that he was deprived of good time credits without due process, and that their loss extended his overall sentence of incarceration. Instead, Cespedes' claim is that his due process rights were violated by a constitutionally flawed prison hearing that was subsequently corrected before his overall sentence was affected by the error.

Where prison disciplinary systems err, and then act promptly before punishment can be visited upon a prisoner as a result of that error, the Second Circuit repeatedly has held that no cause of action exists for that prisoner. In *Young v. Hoffman*, 970 F.2d 1154 (2d Cir.1992) (per curiam), *cert. denied*, 510 U.S. 837, 114 S.Ct. 115, 126 L.Ed.2d 80 (1993), for example, the Second Circuit considered an appeal from a district court's grant of summary judgment and nominal damages to a New York prison inmate who had been sentenced to 180 days' SHU confinement and a loss of six months' good time credit because he was deprived of his right to call witnesses at his Tier III disciplinary hearing. *Id.* at 1155. The prisoner's sentence, however, had been administratively reversed based on his inability to present witnesses at his hearing. *Id.* The Second Circuit reversed the district court's ruling in favor of the prisoner, holding that the prisoner had "suffered no interference with a liberty interest and ha[d] no valid claim for relief" because "the penalty and recommended loss of good time were vacated and the record of the hearing were expunged. [The prisoner] never served a day of the penalty." *Id.* The *Young* Court further explained that

[t]he administrative reversal constituted part of the due process protection he received, and it cured any procedural defect that may have occurred. We believe that, as a policy matter, this possibility of cure

through the administrative appeals process will encourage prison administrators to correct errors as an alternative to forcing inmates to seek relief in state or federal courts.

*Id.* at 1156; *see also Russell v. Scully*, 15 F.3d 219, 222 (2d Cir.1993) (where the inmate would have been confined to SHU irrespective of the hearing which allegedly deprived him of due process, the "inmate [wa]s not deprived of due process where an administrative appeal ... cured a hearing's procedural defects," and the inmate "did not suffer a constitutional harm by the [SHU] confinement during the appeal period") *rev'd in part on other grounds sub nom., Russell v. Selsky*, 35 F.3d 55 (2d Cir.1994).

The Second Circuit reaffirmed this principle in *Walker v. Bates*, 23 F.3d 652 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 852 (1995). There, a prisoner began serving a 120-day SHU confinement sentence following a Tier III hearing at which the prisoner's three requests to call witnesses were denied. *Id.* at 654. Although the prisoner's sentence was overturned on appeal, the prisoner was released only after serving approximately 85 days in SHU. *Id.* at 654 & 656. Judge Miner, however, refused to find that the administrative appeal cured the inmate's due process violation because the inmate's confinement had begun and—unlike the prisoner in *Russell*—was based solely upon the disciplinary sentence unlawfully imposed at his hearing. *Id.* at 657–59.

On their facts, these cases might have turned out differently after *Sandin* because, in accordance with pre-*Sandin* Second Circuit case law, *see, e.g., Wright*, 21 F.3d at 499, they all assume that SHU confinement constitutes a protected liberty interest. Nothing in *Sandin*, however, alters the principle established by the Second Circuit in *Young, Russell*, and *Walker* that a prisoner's successful administrative appeal cures the deprivation of due process where that appeal corrects the constitutional error before the prisoner begins to serve his improperly imposed sentence. It is that principle—in short, a "no harm-no foul" approach—which

controls Cespedes' claim regarding his temporary loss of good time credits.

■ Cespedes was sentenced to one year in SHU and a loss of one year's good time credits. When Cespedes successfully appealed his sentence, his good time credits were fully restored before they could affect the overall length of his sentence of incarceration. As such, he was unharmed by their initial loss, just as the prisoner in *Young* was unharmed by a confinement sentence which he never began to serve. In cases such as these, the prisons' disciplinary systems worked effectively to correct themselves before any harm could come to the inmates. This Court is unwilling to find that a cause of action arises from a prison's effective self-correction. Consequently, this Court finds that, under prevailing Second Circuit case law, Cespedes' claim of a deprivation of due process has been nullified by his successful administrative appeal. *See Walker*, 23 F.3d at 657–59; *Russell*, 15 F.3d at 222; *Young*, 970 F.2d at 1156.

Moreover, this finding is supported by recent, post-*Sandin* decisions by other courts in the Southern District of New York. In *Rivera v. Coughlin*, No. 92 Civ. 3404, 1996 WL 22342 (S.D.N.Y. Jan. 22, 1996), for instance, a prisoner's alleged due process deprivations at his prison hearing resulted in his serving 89 days in disciplinary segregation, loss of commissary and phone privileges, and, until the decision was administratively reversed, twelve days' loss of good time credits. *Id.* at *1. After finding that 89 days in disciplinary confinement "d[id] not constitute an atypical or significant hardship sufficient to create a liberty interest" under *Sandin*, Judge Cote determined that the prisoner "had no valid claim for relief" based on the fact that good time credits had been taken away from him, but were restored on appeal. *Id.* at *5.

Judge Cote first observed that, "[t]o the extent that such a loss would have had the inevitable effect of lengthening [the inmate's] sentence, it would have created a liberty interest which [previously was found to have been] violated … at the [h]earing." *Id.* Judge Cote explained, however, that "[a] loss of good time credits is 'tentative' under New

York [l]aw[ ] until it affects consideration for parole or release," *id.* (citing N.Y.Comp. Codes R. & Regs, tit. 7, § 260.4(b)), and that in the case before her, "with the reversal of the [h]earing [o]fficer's decision, there is no effect on the length of plaintiff's sentence." *Id.* Accordingly, Judge Cote relied on *Walker* for the proposition that, "[s]ince a constitutional violation does not accrue if there has been an administrative reversal of the hearing disposition before the inmate begins to serve the sentence which infringes upon his liberty interest, [the prisoner] has no valid claim for relief." *Id.* (citing *Walker*, 23 F.3d at 658–59). As a result, Judge Cote found that "because [the prisoner's] loss of good time was reversed while it was still tentative … he did not suffer any constitutional deprivation of liberty as a result…." *Id.*

Even more recently, Judge Schwartz came to the same conclusion in *Moore v. Pico*, No. 93 Civ. 2626, 1996 WL 573247, at *5 (S.D.N.Y. Oct. 4, 1996). There, an inmate at Sing Sing alleged that his due process had been violated at a disciplinary hearing. *Id.* at *1. After losing an administrative appeal, the prisoner successfully brought an Article 78 proceeding in New York state court to challenge on due process grounds the sentence imposed at his disciplinary hearing. *Id.* at *1–*2. By the time his sentence was overturned, the prisoner already had served his entire ninety-day SHU term of confinement, so the state court ordered that "all references to the proceeding be expunged from [his] institutional record and that his loss of good time be restored." *Id.* at *2. In the prisoner's subsequent Section 1983 action, Judge Schwartz rejected the inmate's claimed due process deprivation based on his SHU confinement, explaining that, under *Sandin*, the inmate's ninety days in SHU "and other penalties imposed were not an 'atypical or significant hardship' such that [the inmate] should be deemed to have been denied a liberty interest." *Id.* at *4.

In addition, however, the prisoner in *Moore* also "argue[d] that his loss of good time credits entitled him to the due process protections set forth in *Wolff* … because such credits implicate a liberty interest." *Id.* at *5. Judge Schwartz rejected that argu-

ment, relying in part on the fact that "in this case, [the prisoner] never actually experienced the loss of good time credits, since they were restored ... in [his] Article 78 proceeding." *Id.* This rationale plainly conforms to the law of the Second Circuit which, as discussed above, holds that no violation of due process lies if there is a reversal of a hearing decision before a prisoner begins to serve the sentence which infringes upon his liberty interest. *See Walker,* 23 F.3d at 657–59.

To reiterate, in order for Cespedes to set forth a Section 1983 claim based on his temporary loss of good time credits, he must demonstrate that defendants deprived him of a liberty interest. In order to grant summary judgment, this Court must find that no disputed issue of material fact exists with respect to this issue. *Knight,* 804 F.2d at 11. In the case at bar, because Cespedes' good time credits were restored before their loss could have any impact on the length of his sentence, this Court finds that he was not deprived of any liberty interest under Second Circuit law. Having conducted a *de novo* review, this Court finds that there is no disputed issue of material fact with respect to this issue. As a result, this Court finds that defendants Keane and Orengo's motion for summary judgment with respect to Cespedes' 1983 claim based on his loss of good time credits should be granted.

**B. *Non–Moving Defendants Stokes and Alvelo and Plaintiff's Motion for Partial Summary Judgment Against Stokes***

In addition to the five defendants who were dismissed from this action and the two defendants whom this Court just determined should prevail on their motion for summary judgment, there remain two additional defendants—Stokes and Alvelo—who currently have no motion pending before this Court. Cespedes, however, has moved for partial summary judgment against Stokes. Magistrate Judge Grubin recommended that this Court dispose of this litigation with respect Stokes and Alvelo by either: (1) granting summary judgment to them *sua sponte;* or (2) dismissing all claims against them pursuant to this Court's inherent power under

Title 28, United States Code, Section 1915(d) ("Section 1915(d)"). (Report at 8.) In addition, Magistrate Judge Grubin also recommended that Cespedes' motion for partial summary judgment with respect to Stokes should be denied. *Id.*

This Court notes that Cespedes did not specifically object to Magistrate Judge Grubin's recommendations regarding these issues, as required by Rule 72(b). *See generally* (Pltf.Objs.); Fed.R.Civ.P. 72(b). Accordingly, this Court need not undertake a *de novo* review with respect to those recommendations. Nevertheless, in the interest of completeness, this Court will thoroughly and independently examine the merits of each of these issues individually in a *de novo* fashion.

### 1. *Sua Sponte Dismissal of Cespedes' Federal Claims Against Stokes and Alvelo*

Because the Second Circuit has made clear its discomfort with *sua sponte* grants of summary judgment, *see, e.g., B.F. Goodrich v. Betkoski,* 99 F.3d 505, 522 (2d Cir.1996), and because Section 1915(d) is statutorily tailored to *in forma pauperis* actions such as the one at bar, 28 U.S.C. § 1915(d), this Court finds it inappropriate to order a *sua sponte* grant of summary judgment to resolve the claims against Stokes and Alvelo. Instead, this Court will consider the merits of dismissing Cespedes' federal claims against Stokes and Alvelo pursuant to Section 1915(d).

Title 28, United States Code, Section 1915(a) "permits federal courts to allow the commencement of actions without prepayment of filing fees by persons unable to afford the cost of litigation." *Anderson v. Coughlin,* 700 F.2d 37, 42 (2d Cir.1982); 28 U.S.C. § 1915(a) (1989). In order to ensure that the *in forma pauperis* privilege is not abused, Congress provided in Section 1915(d) that such proceedings may be dismissed by a court *sua sponte* if "satisfied that the action is frivolous or malicious," *Anderson,* 700 F.2d at 41 (citations omitted); 28 U.S.C. § 1915(d) (1989), "so as to spare prospective defendants the inconvenience and expense of [defending such actions]." *Neitzke v. Williams,* 490 U.S. 319, 324, 109 S.Ct. 1827, 1831, 104

L.Ed.2d 338 (1989). The rationale underlying this provision is clear:

> Persons proceeding *in forma pauperis* are immune from imposition of costs if they are unsuccessful; and because of their poverty, they are practically immune from later tort actions for "malicious prosecution" or abuse of process. Thus indigents, unlike other litigants, approach the courts in a context where they have nothing to lose and everything to gain. The temptation to file complaints that contain facts which cannot be proved is obviously stronger in such a situation. For convicted prisoners with much idle time and free paper, ink, law books, and mail privileges the temptation is especially strong. As [then-]Justice Rehnquist has noted, "[t]hough [an inmate] may be denied legal relief, he will nonetheless have obtained a short sabbatical in the nearest federal courthouse."

> \* \* \* \* \* \*

> It is plain to this Court that courts need an extra measure of authority when faced with actions proceeding *in forma pauperis*—particularly where the action is brought by a prisoner seeking damages. And it is this Court's conclusion that Congress has granted that extra authority by enacting 28 U.S.C. § 1915(d).

*Jones v. Bales,* 58 F.R.D. 453, 463–64 (N.D.Ga.1972) (quoting *Cruz v. Beto,* 405 U.S. 319, 327, 92 S.Ct. 1079, 1084, 31 L.Ed.2d 263 (1972) (Rehnquist, J., dissenting)). Accordingly, the Second Circuit has advised courts to "keep firmly in mind the fact that the benefit of [Section] 1915 is a privilege, not a right." *Anderson,* 700 F.2d at 42. Courts' ability to dispose of frivolous *in forma pauperis* claims "is necessary because [they] unduly burden the courts, sometimes obscuring meritorious claims, occasion significant expenditures of public monies, and are a means by which plaintiffs can use the federal government to harass individual defendants." *Id.* (citation omitted).

Nevertheless, the Second Circuit has "repeatedly cautioned against use of this procedure where the complaint, which must be construed liberally in favor of the *pro se* plaintiff, alleges facts amounting to a violation of 42 U.S.C. § 1983[,] . . . [and where] the adverse party has not been served . . . [because] we do not have the benefit of the defendant's answering papers." *Fries v. Barnes,* 618 F.2d 988, 989 (2d Cir.1980) (citations omitted); *see also Pino v. Ryan,* 49 F.3d 51, 53 (2d Cir.1995). "[E]xpansion of the record," by awaiting defendant's answer, "protects the unskilled litigant and enables the court to make an informed decision regarding the merits of an action...." *Anderson,* 700 F.2d at 41 (citation omitted).

Bearing these "special considerations" in mind, *id.* at 42, courts must determine whether an *in forma pauperis* plaintiff's claims are "frivolous" within the meaning of Section 1915(d). The Supreme Court has defined an *in forma pauperis* complaint to be frivolous "where it lacks an arguable basis in either law or fact." *Neitzke,* 490 U.S. at 325, 109 S.Ct. at 1831.

In the past, several Circuit Courts, including the Second Circuit, held that a plaintiff's failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure ("Rule") 12(b)(6) was sufficient for a dismissal as frivolous under Section 1915(d). *See, e.g., Anderson,* 700 F.2d at 43. In *Neitzke,* however, the Supreme Court unanimously distinguished between Rule 12(b)(6) and Section 1915(d), and held that, "while the overlap between [Rule 12(b)(6)'s failure-to-state-a-claim standard and Section 1915(d)'s frivolousness standard] is considerable, it does not follow that a complaint which falls afoul of the former standard will invariably fall afoul of the latter." 490 U.S. at 326, 109 S.Ct. at 1832. Justice Marshall explained that, "[t]o the extent that a claim filed *in forma pauperis* which fails to state a claim lacks even an arguable basis in law, Rule 12(b)(6) and [Section] 1915(d) both counsel dismissal. But the considerable common ground between these standards does not mean that one invariably encompasses the other." *Id.* at 328, 109 S.Ct. at 1833.

The distinction between the two provisions is that Rule 12(b)(6) permits dismissals based solely on a complaint's legal infeasibility, even in close cases, while Section 1915(d) permits judges to dismiss complaints based

on "fanciful" or "delusional" factual allegations, in addition to complaints lacking arguable legal bases. Rule 12(b)(6), the Court explained,

> authorizes a court to dismiss a claim on the basis of a dispositive issue of law.... Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously unsupportable. On the contrary, if as a matter of law it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one. What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.

*Id.* at 328, 109 S.Ct. at 1834 (internal quotation omitted). Section 1915(d), on the other hand, "has a separate function," which

> accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.

*Id.* at 327, 109 S.Ct. at 1833.

██ In the case at bar, this Court finds it appropriate to exercise its authority under Section 1915(d), and dismiss as frivolous Cespedes' federal claims against defendants Stokes and Alvelo. This Court bases its finding upon two considerations. First, unlike a great many Section 1915(d) dismissals, *see Neitzke,* 490 U.S. at 324, 109 S.Ct. at 1830, this Court has elected not to exercise its *sua sponte* Section 1915(d) power without first permitting plaintiff the opportunity to extract a response from defendants. This Court has awaited not only the filing of defendant's answer in this case, but also numerous motions and supporting affidavits from both parties. This case has been pending for nearly seven years—the last four of which plaintiff has had the assistance of counsel—and plaintiff has thus had both the time and presumably the legal guidance to establish a non-frivolous cause of action. Moreover, although Magistrate Judge Grubin

recommended that this Court dismiss this action *sua sponte,* (Report at 8), plaintiff's objections to those recommendations nowhere address the issue of *sua sponte* dismissal or explain specifically why his claim is not frivolous. *See generally* (Pltf.Objs.) Plaintiff thus had seven years and multiple filings to establish a cause of action and was on notice that this Court had received a recommendation to *sua sponte* dismiss his claims, yet chose not to attempt to persuade this Court that such a disposition is inappropriate.

Second, and most importantly, this Court finds that plaintiff has, in fact, failed to allege a non-frivolous cause of action. As this Court described in detail above, plaintiff's Section 1983 claim based on his 104-day SHU confinement and his temporary loss of good time credits simply cannot stand in the face of *Sandin* and the Second Circuit's numerous holdings which eliminate inmates' causes of action for errors in prison disciplinary proceedings which are corrected before the prisoner suffers a harm. *See, e.g., Walker,* 23 F.3d at 657–59. This Court finds that in light of the overwhelming weight of the case law against him, plaintiff's Section 1983 action lacks any arguable basis in the law, and thus, is properly dismissed pursuant to Section 1915(d). Plaintiff's case is not a "close call" which would be better dismissed via a Rule 12(b)(6) motion. Rather, on the basis of Cespedes' factual allegations and the law which controls his Section 1983 claims, this Court previously has found that defendants Keane and Orengo's motion for summary judgment should be granted. For the same reasons, this Court finds that there is absolutely no basis in existing law or in the facts of this case upon which Cespedes may prevail over defendants Stokes and Alvelo. Having granted Keane and Orengo's motion, this Court finds no justifiable reason to compel Stokes and Alvelo to bring a Rule 12(b)(6) motion to accomplish later what can be done immediately. Accordingly, this Court finds that plaintiff's Section 1983 claims against non-moving defendants Stokes and Alvelo should be dismissed pursuant to Section 1915(d).

### 2. Plaintiff's Cross–Motion for Partial Summary Judgment

Additionally, this Court finds that Cespedes' cross-motion for partial summary judgment with respect to defendant Stokes should be denied. To reiterate, summary judgment is appropriate where a court finds that no disputed issue of material fact exists. *Knight*, 804 F.2d at 11. For the reasons described above, this Court finds that Cespedes pleadings' rely upon a frivolous legal theory with respect to his federal claims. Accordingly, this Court finds that Cespedes' cross-motion for summary judgment should be denied.

### C. Plaintiff's Motion to Amend his Complaint

Cespedes' initial *pro se* Complaint contained claims against nine defendant prison officials based not only on Section 1983, but also on state claims for, *inter alia,* "physical and psychic suffering" and "emotional distress." (Complaint at 3.) Cespedes now seeks to amend that Complaint, substituting one drafted by counsel which eliminates his state law claims and which directs his Section 1983 action against just four defendants: Stokes, Alvelo, Keane and Orengo. Cespedes claims that the amended Complaint would "simply restate[ ] the legal theories and facts asserted in the *pro se* pleading." (Pltf.Partial SJ Memo at 8.) Defendants oppose Cespedes' motion to amend his Complaint. (Memorandum of Law in Opposition to Plaintiff's Cross–Motion for Partial Summary Judgment and in Partial Opposition to Plaintiff's Motion to Amend Complaint, *Cespedes v. Coughlin,* 90 Civ. 2667 (Dec. 7, 1992).) Magistrate Judge Grubin recommends that this Court deny plaintiff's motion to amend his Complaint. (Report at 9.)

Federal Rule of Civil Procedure ("Rule") 15(a) permits a party to amend its pleadings after his adversary has filed a responsive pleading "only by leave of court . . . and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). Because Rule 15(a) is broadly written to permit liberal pleading amendments, a "court may not impose arbitrary restrictions on the availability of amendments or use its discretion in a way that undermines the basic policy of the rule." 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1487, at 612 (1990). In *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962), the Supreme Court enunciated the following general standard to be employed by lower courts in applying Rule 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules requires, be "freely given."

*Id.* at 182, 83 S.Ct. at 230. Of these factors, perhaps the most frequent reason for denying leave to amend is that the opposing party will be prejudiced if the movant is permitted to amend his pleading. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330–31, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971). Conversely, "if the court is persuaded that no prejudice will accrue, the amendment should be allowed." 6 Wright, *et al.* § 1487, at 613–14. In considering the existence and degree of prejudice, "the facts of each case must be examined to determine if the threat of prejudice is sufficient to justify denying leave to amend." *Id.* at 621.

In the case at bar, Cespedes' proposed Complaint drops his state law claims, and alleges Section 1983 claims against only Stokes, Alvelo, Keane and Orengo. As previously discussed at length, however, this Court has found that Cespedes' Section 1983 claims against all four defendants must fail. Nevertheless, it is not for this Court to instruct Cespedes concerning which of his potential claims he should bring. If Cespedes wishes to withdraw his other previously pleaded causes of action, that is his prerogative. Moreover, this Court finds that this case presents a peculiar instance in which denying plaintiff's motion to amend his Com-

plaint may actually harm defendants. Such a denial would have the perverse (not to mention prejudicial) effect of forcing the four remaining defendants to litigate state law claims which Cespedes would prefer not to bring. Since this Court already has found that Cespedes' Section 1983 claims should be stricken, if Cespedes is not permitted to amend his Complaint, defendants would be prejudiced by being compelled to continue this litigation. Complicating matters further, those vestigial state law claims would likely be litigated in New York state court, for reasons which this Court describes below. By granting Cespedes' request to amend his Complaint, this litigation can terminate immediately, thus freeing defendants of their obligation to participate in this lawsuit. As a result, this Court finds that Cespedes' motion to amend his Complaint should be granted.

This Court notes that if Cespedes' motion to amend his Complaint was denied, or if Cespedes elects not to amend his Complaint after permission to do so is granted, this Court is not obligated to retain jurisdiction over his state-law claims. Generally, "a district court may exercise supplemental jurisdiction over pendent state claims when it has jurisdiction over associated federal claims that form 'part of the same case or controversy.'" *Sriram v. Preferred Income Fund III Ltd. Partnership*, 22 F.3d 498, 501 (2d Cir.1994) (quoting 28 U.S.C. § 1367); *United Mine Workers v. Gibbs*, 383 U.S. 715, 725–28, 86 S.Ct. 1130, 1138–40, 16 L.Ed.2d 218 (1966). In the case at bar, however, once this Court dismisses Cespedes' federal claims, there is no longer an underlying federal claim to provide this Court with supplemental jurisdiction over Cespedes' state law claims. *Doe v. Karadzic*, 866 F.Supp. 734, 743–44 (S.D.N.Y.1994), *rev'd on other grounds*, 70 F.3d 232 (2d Cir.1995). As a result, if this Court denied Cespedes' motion to amend his Complaint, this Court should also dismiss Cespedes' state claims for lack of jurisdiction. *Morse v. University of Vermont*, 973 F.2d 122, 127 (2d Cir.1992) ("in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims"). Cespedes would then be free to bring his state law claims against defendants in New York state court.

To clarify, following the instant Opinion, the status of plaintiff's claims is as follows. Plaintiff's claims against defendants Roman, Doe, Coughlin, Greiner and Fields were dismissed prior to the instant Opinion. This Court herein found that defendants Keane and Orengo should be granted summary judgment with respect to plaintiff's Section 1983 claims. Likewise, this Court herein found that plaintiff's Section 1983 claims against defendants Stokes and Alvelo should be *sua sponte* dismissed, and that plaintiff's cross-motion for summary judgment against Stokes should be denied. Finally, because this Court herein found that plaintiff should be permitted to amend his Complaint to eliminate his state law claims, if plaintiff elects to do so, he will have no claims, state or federal, against any defendant.

## CONCLUSION

IT IS HEREBY ORDERED THAT the summary judgment motion of defendants Keane and Orengo is GRANTED.

IT IS FURTHER ORDERED THAT plaintiff's federal claims against defendants Stokes and Alvelo are DISMISSED.

IT IS FURTHER ORDERED THAT plaintiff's cross-motion for partial summary judgment is DENIED.

IT IS FURTHER ORDERED THAT plaintiff's motion to amend his Complaint is GRANTED.

SO ORDERED.